# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **James J. England,** | : | |
| **c/o Routte Law, LLC** | : | **Case No. 2:17-cv-104** |
| **142 Granville Street** | : | |
| **Gahanna, OH  43230** | : | **Judge** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **COMPLAINT AND JURY DEMAND** |
| **v.** | : | |
| | : | |
| **City of Columbus, Ohio** | : | |
| **77 North Front Street** | : | |
| **Columbus, OH 43215;** | : | |
| | : | |
| **Officer Keith Abel** | : | |
| **Columbus Division of Police** | : | |
| **120 Marconi Blvd** | : | |
| **Columbus, OH  43215;** | : | |
| | : | |
| **Officer Douglas Fulwider** | : | |
| **Columbus Division of Police** | : | |
| **120 Marconi Blvd** | : | |
| **Columbus, OH  43215;** | : | |
| | : | |
| **Officer Armando Dungey** | : | |
| **Columbus Division of Police** | : | |
| **120 Marconi Blvd** | : | |
| **Columbus, OH  43215;** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Sergeant Kenneth Griffis** | : | |
| **Columbus Division of Police** | : | |
| **120 Marconi Blvd** | : | |
| **Columbus, OH  43215,** | : | |
| | : | |
| **Defendants.** | : | |

## I. Preliminary Statement

1.      This civil rights Complaint under 42 U.S.C. § 1983 by Plaintiff against Defendants as a result of their use of excessive force and other wrongful acts, occurring in and around the City of Columbus, Ohio on February 6, 2015.

2.      The Officers named herein (hereinafter "Officer Defendants" collectively) are sued both in their individual and official capacities.

3.      The City of Columbus (hereinafter the "City") is sued as a result of the Officer Defendants' actions within the course and scope of their authority, as caused by and/or ratified by the City.

4.      On the morning of February 6, 2015, officers from Columbus Police Department arrived at Plaintiff's home to serve a warrant for his arrest.

5.      While executing an arrest warrant on Mr. England, Officers were able to fully handcuff Mr. England behind his back and advise him that he was under arrest. Officers tried to pull Mr. England over an approximately five-foot-tall fence in Mr. England's backyard. The officers dropped Mr. England, causing him to fall forward. Officer Keith Abel proceeded to shoot Mr. England two times, once in the back and once in the back of his leg. Mr. England was handcuffed behind his back and under arrest at the time he was shot.  Plaintiff seeks fair compensation for the violation of his civil rights and injuries and seeks to deter future acts of police misconduct in the City of Columbus.

## II. Jurisdiction and Venue

6.      Jurisdiction over the federal civil rights claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a).Venue is proper in this division.

### III. Parties

7.     Plaintiff, James J. England, is a resident of the City of Columbus, Franklin County, Ohio.

8.     Defendant City of Columbus, Ohio, (hereinafter "City") is a unit of local government organized under the laws of the state of Ohio.  Defendant City is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

9.     Defendant Keith Abel is and was at all times relevant to this action a police officer employed by Defendant City of Columbus. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacity.

10.     Defendant Douglas Fulwider is and was at all times relevant to this action a police officer employed by Defendant City of Columbus. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual and official capacity.

11.     Defendant Armando Dungey is and was at all times relevant to this action a police officer employed by Defendant City of Columbus.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual and official capacity.

12.     Defendant Kenneth Griffis is and was at all times relevant to this action a sergeant and police officer employed by Defendant City of Columbus.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual and official capacity.

## IV. Facts

13.     James J. England lives at 2756 Dolby Drive, Columbus, Ohio 43207. He is currently incarcerated at Ross Correctional Institution.

14.     On the morning of February 6, 2015, at approximately 10a.m., Columbus Police executed an arrest warrant for James J. England at his residence, 2756 Dolby Drive, Columbus, Ohio.

15.     Upon arrival at the Dolby Drive address, Officer Abel went to the rear of the residence to cover that exit.

16.     Officers Fulwider, Dungey and Sergeant Griffis went to the front of the residence in order to make initial contact with Mr. England.

17.     Officer Fulwider and Dungey knocked on the front of the house and initially made verbal contact with Mr. England through the front door.  Mr. England acknowledged their presence and stated he would open the door as soon as he was able to secure his dogs.

18.     After several moments, Officer Fulwider heard Officer Abel at the rear of the house giving Mr. England verbal commands to submit to handcuffing.

19.     Officers Fulwider and Dungey then moved to the rear of the residence and joined Officer Abel, who had his Taser drawn and pointed at Mr. England.

20.     The officers were separated from Mr. England by a fence/plywood wall which had a tall screen door that was latched shut from the inside. The door was partially covered with plywood leaving an opening of about 3 feet tall.  The officers were able to fully observe Mr. England because the door had an opening that was approximately 4 to 5 feet high and surrounded by a stockade, wood privacy fence of equal height (See Exhibit A).

21.     Officer Fulwider reached though the upper part of the opening in the door and was able to partially secure Mr. England in handcuffs by securing one handcuff on Mr. England's left wrist.

22.    Officer Abel stepped up on a bucket outside the door and further assisted Officer Fulwider in gaining full control of Mr. England by fully securing him in handcuffs, behind his lower back, by handcuffing his right wrist.  Officer Fulwider confirmed these facts during his post shooting interview.

23.    At some point during this interaction, Officer Abel dropped his Taser outside the fence and out of Mr. England's reach.  Officer Abel's Taser remained on the ground outside the fence during the rest of the incident.

24.    At no point did Mr. England actively resist arrest.

25.    Officer Abel agreed during his post incident interview with Sergeant Pilya, with counsel present, that Mr. England was only passively resisting and not actively resisting or engaging any officers or himself.

26.    With Mr. England secured in handcuffs, the officers attempted to figure out how to get the door and bring Mr. England outside the fence.

27.    Mr. England's two dogs then came out of the residence via a dog door.  The officers were concerned with the actions of the dogs as they were barking and running back and forth near Mr. England.  Mr. England yelled at the dogs, ordering them back in the house.  One dog complied.  One dog remained outside near Mr. England.

28.    At some point, Officer Abel un-holstered his firearm in anticipation of a possible confrontation with the dog(s).

29.    Officer Dungey took control of Mr. England.  Officer Abel and Officer Dungey then began pulling Mr. England by his handcuffed arms with his back facing them through the small opening in the upper part of the door.  Officer Fulwider grabbed Officer Abel's gun belt to stabilize him and prevent him from falling over the door onto the back patio.

30.     The officers were unable to pull Mr. England, backward, arms first, through the opening in the door.

31.     The Officers pushed Mr. England forward as they dropped him.

32.     Officer Able discharged his firearm twice.

33.     Officer Abel confirmed during his interview with Sergeant Pilya that the officers at no time after originally placing hands on Mr. England lost control of him. (Exhibit B)

34.     Officer Abel, during his interview with Sergeant Pilya confirmed that he never observed a weapon on Mr. England's person or in close proximity to Mr. England before or at the time Officer Abel discharged his weapon.

35.     Officer Abel did not recollect seeing the dogs at the time he discharged his weapon. When Officer Abel was asked about the dogs at the time he discharged his weapon, he stated "I don't' remember seeing the dogs."   Officer Abel continued stating "I was so focused on the threat and him." Id.

36.     Officer Abel was asked specifically by Sergeant Pilya, "At the time you fired your weapon, what was your target?"   Officer Abel answered "Him." Referring to Mr. England. Sergeant Pilya then asked Officer Abel specifically "what part of him? I mean you're in close proximity with him."   Sergeant Pilya followed that question by asking "aiming for a certain part of his body?" Officer Abel responded "just thinking center mass."   Officer Abel continued by explaining that he thought he might fall through the opening.  He then stated he "raised the gun and stopped the threat." Id.

37.     At point blank range while standing on a bucket outside of the five-foot fence, Officer Abel shot Mr. England in his lower, right back.  The trajectory of the bullet was such that it is apparent that Mr. England was fully bent over at the time.  The bullet passed through Mr.

England's lower back, through his liver and diaphragm, into his upper chest missing his lung and causing extensive internal damage and blood loss. The bullet remains lodged in Mr. England's upper, right chest area.

38.     At point blank range, Officer Abel fired a second shot which struck Mr. England in his right lower calf. The bullet passed through soft tissue and through Mr. England's shin bone.

39.     Sergeant Pilya asked Officer Abel, "At the time you fired your weapon, how far from the suspect would you say the end of the barrel of your firearm was?" Officer Abel responded "Aw, maybe a couple feet."(Exhibit B)

40.     Officer Dungey discharged his Taser at approximately the same time that Officer Abel discharged his firearm.

41.     Mr. England, afraid for his life after being shot twice while handcuffed, crawled toward the rear door of his residence and crawled through the dog door.

42.     Officer Defendants entered the residence and found Mr. England laying on the floor bleeding.

43.     Sergeant Pilya asked Officer Abel, "At the time you fired your weapon, you were firing at the suspect and not the dogs, is that correct?" Officer Abel replied "Correct." (Exhibit B)

44.     Sergeant Pilya asked Officer Abel, "At the time you fired your gun, did you still have a hold of the suspect? Because that kinda how it reads." Officer Abel replied "I don't…" Id.

45.     Sergeant Pilya asked Officer Abel, "Were you firing at the suspect due to his attempt him to flee back into the house?" Officer Abel replied, "No.". Id.

46.      Officer Dungey was also interviewed after the shooting and recalled the handcuffing of Mr. England. Officer Dungey stated that he observed Officers Fulwider and Abel secure Mr.

England with handcuffs. Officer Dungey expressed surprise during his interview that Officer Abel discharged his firearm at Mr. England.

47.     Officer Dungey, during his interview recalled Officer Abel stating "I shot my gun." Officer Dungey stated that he replied, "you shot your gun?!" Officer Dungey was surprised by the fact that Officer Abel had used deadly force. (Exhibit C)

48.     At all times during the incident, Plaintiff was securely handcuffed behind his back.

49.     At no time during this incident could it be described as a tense, uncertain or rapidly evolving circumstance calling for a split second decision.

50.     The officers had full control of Plaintiff during the entire incident.

51.     Officers Fulwider and Sergeant Griffis acted with reckless indifference for Plaintiff's life and failed to intervene and protect Plaintiff, who was in their custody, from excessive and deadly force.

52.     Officer Keith Abel's conduct is unjustified, unprovoked and grossly disproportionate to the actions of Plaintiff and amounted to the use of excessive force in violation of his clearly established Fourth Amendment rights.

53.     Therefore, all of the officers involved are jointly and severally liable for the excessive force used against Plaintiff and the failure to intervene to stop the use of excessive force, which caused injuries and damages to Plaintiff.

### Policies, Practices, and Ratification

54.     Defendants have each acted negligently, intentionally, recklessly, and with deliberate indifference to the constitutional rights of James J. England.

55.     The use of force by Defendant Keith Abel was excessive force and violated clearly established use of force policy and law.

56.     The use of force by Defendant Armando Dungey in deploying his Taser at Plaintiff violated established use of force policy and law.

57.     The failure to intervene by Defendants Dungey, Fulwider and Griffis violated clearly established use of force policy and law.

58.     The policies, customs, patterns and practices of Defendant City of Columbus were the moving force behind the constitutional violations suffered by Plaintiff.

59.     Although the policymakers were on notice of the obvious need to train and supervise police in the areas of arrest and the proper use of deadly force, Defendant City failed to train and supervise the Officer Defendants. As such, Defendant City was deliberately indifferent to the rights of its citizens, including Plaintiff.

60.     Defendant City has approved, ratified, and knowingly acquiesced in the conduct of all the individual Defendant police officers.

61.     Defendant City conducted an internal investigation into the conduct of the Officer Defendants but failed to act appropriately after the conclusion of that investigation. Defendant City failed to discipline Officer Defendants for the conduct set out in this complaint.

62.     Defendant City did not make any policy changes or provide additional training as a result of the conduct set out in this complaint.

63.     Defendant City ratified the actions of Officer Defendants present during the arrest of Plaintiff.

### **Harm to Plaintiff**

64.     As a direct and proximate cause of the conduct of the Defendants, Plaintiff James J. England has suffered permanent musculoskeletal and organ damage which causes continual pain and will have an ongoing impact on his quality and length of life.

65.     As a direct and proximate result of the wrongful actions of Defendants, Plaintiff James J. England has sustained and continues to sustain great pain and suffering, mental anguish and severe emotional distress.

66.     As a direct and proximate cause of the conduct of Defendants, Plaintiff James J. England suffered an unnecessary shooting, endured severe injuries and suffering, and continues to endure physical pain and anguish.

67.     The injuries, damage, and relief which Plaintiff seeks from the Defendants jointly and severally, include but are not limited to:

   a.   Damages for physical pain and suffering of the past, present and future;

   b.   Damages for emotion pain and suffering of the past, present and future;

   c.   Damages for medical expenses of the past, present, and future;

   d.   Damages for incidental and consequential damages stemming from attending to the injuries of Plaintiff;

   e.   Damages for loss of enjoyment of life of the past, present, and future;

   f.   Scars and disfigurement;

   g.   Damages for loss of earning capacity;

   h.   Punitive damages;

   i.   Pre and Post judgment interest;

   j.   Attorney's fees;

   k.   A Declaratory Judgment that the acts and conduct herein is unconstitutional;

   l.   Injunctive relief precluding the Defendants from engaging in the conduct herein and in the future and requiring the City of Columbus to provide proper policy,

training and supervision of its officers and holding them accountable for their misconduct; and

m. All such relief, both general and specific, to which Plaintiff may be entitled.

## FIRST CLAIM FOR RELIEF - §1983
## Violation of 4TH AND 14TH Amendments

68.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 67 of the Complaint as if specifically rewritten herein.

69.     In committing the acts described herein, Defendants acted jointly and under color of law to deprive Plaintiff of his clearly established constitutionally protected rights under the Fourth and Fourteenth Amendments of the United States Constitution including but not limited to:

   a.  Freedom from unreasonable seizure;

   b.  Freedom from the use of unreasonable, unjustified and excessive force;

   c.  Freedom from summary punishment;

   d.  Freedom from the prevention of officers using excessive force; and

   e.  Freedom from arbitrary governmental activity which shocks the conscience of civilized society.

70.     In violating Plaintiff's rights as set forth above and other rights that will be proven at trial, Defendants acted under color of law and conducted an unreasonable seizure of Plaintiff and utilized unnecessary, unjustified, unreasonable and excessive force.

71.     Further, the acts or conduct committed by Officers Abel and Dungey against Plaintiff occurred in the presence of each other and the other Officer Defendants further violated Plaintiff's constitutional right by failing to intervene and prevent the violation of Plaintiff's constitutional rights by fellow officers.

72.     Sergeant Griffis is also individually liable as supervisor who directly participated in the violation of Plaintiff's rights.

73.     As a direct and proximate result of the violation of his constitutional rights by Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF
### Violation of the Eighth Amendment

74.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 73 of this Complaint as if specifically rewritten herein.

75.     Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from cruel and unusual punishment.

76.     Defendants Abel and Dungey engaged in extreme and excessively cruel conduct toward Plaintiff, as described above, which constitutes cruel and unusual punishment.

77.     The actions of Defendants Abel and Dungey constituted unnecessary and wanton infliction of pain and suffering and were extreme and excessively cruel.

78.     Defendants Abel and Dungey acted maliciously by undertaking, without just cause for reason, a course of action intended to cause extreme pain and suffering and/or death.

79.     As a direct and proximate result of the violation of Mr. England's constitutional rights by Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C. §1983.

## THIRD CLAIM FOR RELIEF
### Failure to Supervise

80.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 79 of the Complaint as if specifically rewritten herein.

81.     Defendant City is under a constitutional duty to properly train, supervise and discipline members of their police department to ensure that policing activities are ran in a lawful manner, preserving to the citizens of the City of Columbus the rights, privileges and amenities guaranteed them by the Constitution of the United States and the State of Ohio and the laws of the United States of America and the State of Ohio.

82.     Defendant City failed in its constitutional duty by permitting, encouraging, tolerating, and knowingly acquiescing to an official pattern, practice or custom of its police officers including the Officer Defendants, violating the constitutional rights of the public at large, including Plaintiff's.

83.     The actions of Officer Defendants stated herein were unjustified, unreasonable, unconstitutional, excessive and grossly disproportionate to the actions of Plaintiff, if any, and constitute an unreasonable seizure effectuated through the use of excessive force and unreasonable force and the deprivation of Plaintiff's due process protections in violation of the rights secured by the Fourth and Fourteenth Amendments of the Constitution of the United States.

84.     Each of the individual Defendants had a duty to supervise and prevent the other officers at the scene from violating Plaintiff's constitutional rights.

85.     The City of Columbus is directly liable for the violation of Plaintiff's constitutional rights due to the following policies, practices or custom which were in effect at the time of this incident and which were the moving force behind the violation of Plaintiff's constitutional rights.

        a.  Defendant City failed to adequately and properly train and educate its officers with respect to procedures to employ when interacting with citizens, including seizures, detentions, arrests, the proper use of force, the methods of appropriate

Taser use and deployment, the proper application of deadly force and deployment of a firearm, and creating an atmosphere where illegal and unconstitutional behavior is tolerated and accepted in deliberate indifference and reckless disregard to the welfare of the public at large, including Plaintiff.

b. Defendant City failed to properly supervise and discipline its officers with respect to the violations of the Constitution of the United States, and their own policies regarding the use of force, the use of Tasers, the use of deadly force and deployment of a firearm, creating a pattern, policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is tolerated, condoned, and accepted in deliberate indifference and reckless disregard to the public at large, including Plaintiff.

c. Defendant City failed to adequately monitor and evaluate the performance of its officers and their compliance with the laws and policies, practice and customs with respect to the use of force, and use of Tasers and firearms, with deliberate indifference and reckless disregard to the public at large, including Plaintiff.

d. Defendant City failed to adequately respond to and investigate complaints regarding officer misconduct by the citizenry, including, but not limited to complaints regarding detention, arrest, use of force and the use of Tasers and firearms. Thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, and deliberate indifference and reckless disregard to the rights of the public at large, including Plaintiff.

e. Defendant City has a policy, practice or custom exonerating officers regarding complaints of misconduct including but not limited to detention, arrests, the use of force, and the use of Tasers and firearms, creating an atmosphere where illegal and unconstitutional behavior is condoned, tolerated, or approved in deliberate indifference and reckless disregard to the rights of the public at large, including Plaintiff.

f. Defendant City has a policy, practice or custom of allowing its officers to use excessive and/or unreasonable force without fear of discipline creating an atmosphere which such behavior is accepted, approved and ratified, in reckless disregard and deliberate indifference to the welfare of the public at large, including Plaintiff.

g. Defendant City is liable for the actions of the Officer Defendants by virtue of the fact that they were informed of improper conduct of the Officer Defendants and failed to discipline them, evidencing that the conduct of the Officer Defendants at the time of the events described herein was in conformity with existing policies, practices, and customs of Defendant City, and that Defendant City ratified the unlawful acts of the Officer Defendants.

h. Accordingly, Defendant City ratified, condoned and approved the Officer Defendants' conduct in all respects.

i. Under currently existing law, Defendant City is liable for constitutional violations committed by Officer Defendants under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, respondents superior, joint

venture, contract and as a result of their non-delegable duty to provide officers to comply with the Constitution and law of the United States and the State of Ohio.

j. As a direct and proximate result of the foregoing policies, practices and customs Defendant City is responsible for the violations of the constitutional rights by the Defendants which were substantially certain to occur and were the moving force behind the violation of Plaintiff's constitutional rights.

**FOURTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**

86.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 85 of the Complaint as if specifically rewritten herein

87.     Officer Defendants owed a duty of care to Mr. England.

88.     It was reasonable and foreseeable that Mr. England would suffer severe emotional injuries from the unjustifiable use of excessive and deadly force.

89.     Officer Defendants' actions breached the duty of care owed to Mr. England and caused him harm and the violation of his Constitutional rights.

90.     Officer Defendants inflicted emotional distress on Mr. England.

91.     As a direct and proximate result of Officer Defendants' unlawful conduction, Plaintiff Mr. England has suffered and continues to suffer debilitating emotional distress.

**JURY DEMAND**

92. Plaintiffs request a jury on all claims triable to a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A.      Award Plaintiffs compensatory damages against defendants in an amount to be

shown at trial;

B.      Award Plaintiffs punitive damages against the individual defendants as

appropriate, but not against the City of Columbus, in an amount to be shown at

trial;

C.      Award Plaintiffs reasonable attorney fees pursuant to 42 U.S.C. § 1988 and any

other applicable law;

D.      Award Plaintiffs prejudgment interest and post judgment interest;

E.      Award Plaintiffs such other and further relief, as the Court deems appropriate.


Respectfully submitted,

/s/ C. Christopher Alley
Jennifer L. Routte (0085204)
Jen.Routte@routtelaw.com
C. Christopher Alley (0086182)
Chris.Alley@routtelaw.com
ROUTTE LAW, LLC.
142 Granville Street
Gahanna, OH 43230
T 614-475-7008
F 614-472-4155
Attorneys for Plaintiff

/s/ Jo Kaiser
Jo Kaiser (0072449)
jhanskaiser@hotmail.com
155 W. Main Street
Suite 100
Columbus, OH  43215
Phone: (614) 224-8484
Attorneys for Plaintiff



Ex. A

# COLUMBUS DIVISION OF POLICE

## FORMAL STATEMENT OF INVOLVED OFFICER

The following will be the audio-recorded *Formal Statement* of **COLUMBUS POLICE OFFICER KEITH ABEL, BADGE #2054**, assigned to Patrol, 13 Precinct, A Company.  This statement was made in the presence of:

| | |
|---|---|
| Sgt. Eric I. Pilya #5115 | Homicide Cold Case/C.I.R.T. Sgt. |
| Det. Martin Kestner #1827 | Homicide  Shift/C.I.R.T./Lead |
| Sgt. David Sicilian #5182 | Homicide First Shift /C.I.R.T. |
| Attorney Robert Byard | Counsel for Officer Abel |

This statement was conducted at Columbus Police Headquarters, third floor conference room, on March 3, 2015, beginning at approximately 8:10 a.m.

Questions were by Sgt. Pilya; transcription was completed by Police Secretary Allison Fishburn.

\*\*\*\*\*\*\*     \*\*\*\*\*\*\*     \*\*\*\*\*\*\*     \*\*\*\*\*\*\*     \*\*\*\*\*\*\*     \*\*\*\*\*\*\*     \*\*\*\*\*\*\*

This is in reference to:

| REPORT | CLASSIFICATION | INVOLVED OFFICER(S) | CASE FILE |
|---|---|---|---|
| 150106935 | Police Involved Situation | P.O. Keith Abel #2054 | PIS 2015-0005 |

This Police Involved Situation, involving the above listed officer, occurred at 2756 Dolby Drive, on February 6, 2015.

| | |
|---|---|
| Sgt. Pilya: | Officer, on February 6, 2015, then third shift Homicide Sergeant David Sicilian conducted an *Initial Interview* with you, concerning the incident, which occurred at 2756 Dolby Drive.  At that time, you declined to make a statement concerning the incident under investigation.  I understand that you have conferred with an attorney since that time and you are now prepared to give a statement concerning your involvement in, and or knowledge of, the incident.  Is that correct? |
| P.O. Abel: | That's correct. |
| Sgt. Pilya: | On March 2, 2015, I received a written statement from Attorney Byard on your behalf.  Is the statement you have before you the same as the one that was sent to me? |

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #2

P.O. Abel:     It is.

Sgt. Pilya:    Have there been any changes, additions, or deletions to that statement since the
               time it was sent to me?

P.O. Abel:     No.

Sgt. Pilya:    Is this voluntary statement a true and accurate description of the facts of the
               incident to the best of your recollection?

P.O. Abel:     Yes.

Sgt. Pilya:    Would you please sign this statement in our presence with todays date?

P.O. Abel:     (Signing) Today is the 3rd?

Sgt. Pilya:    It is.

Sgt. Pilya:    Let the record reflect that this written statement will become a permanent part of
               this case package. Do you wish to voluntarily answer the follow-up questions we
               have for you at this time?

P.O. Abel:     Yes.

Sgt. Pilya:    For the record, your attorney is present with you, and you are represented by his
               counsel at this time, is that correct?

P.O. Abel:     Yes.

Sgt. Pilya:    What is your date of appointment to the Columbus Division of Police?

P.O. Abel:     11/3…Yeah…11/3/96.

Sgt. Pilya:    Do you wear glasses, contact lenses, or a hearing aid?

P.O. Abel:     I do not.

Sgt. Pilya:    Do you have any physical disabilities?

P.O. Abel:     No.

Sgt. Pilya:    Are you currently on any prescription or over-the-counter medication that would
               impair your duties?

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #3

| | |
|---|---|
| P.O. Abel: | No. |
| Sgt. Pilya: | Have you consumed alcohol in the past twenty-four (24) hours? |
| P.O. Abel: | No. |
| Sgt. Pilya: | When you first observed the suspect, did you positively identify him as the James England that you observed in the mugshot at the substation? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Can you describe him in greater detail as you observed him then? |
| P.O. Abel: | Uh…I'm sorry when is then? |
| Sgt. Pilya: | When you first observed him, when he first came out the back door, can you describe him in greater detail? |
| P.O. Abel: | Uh, Yeah I mean, he, it, was a pretty distinct looking guy, kinda taller skinny guy, tats on his neck, you know kinda got pointy ears, and stuff like that, male white, Uh… |
| Sgt. Pilya: | What…what was he wearing at that time? |
| P.O. Abel: | I couldn't tell…. |
| Sgt. Pilya: | Clothing wise? |
| P.O. Abel: | I couldn't tell ya. |
| Sgt. Pilya: | Did he have on like a big jacket or was he just wearing a shirt? |
| P.O. Abel: | I couldn't tell ya. |
| Sgt. Pilya: | Okay.  Nothing about what he was wearing, you recall? |
| P.O. Abel: | No. |
| Sgt. Pilya: | Colors? |
| P.O. Abel: | Uh… |
| Sgt. Pilya: | Light, Dark, nothing?  Okay. |
| P.O. Abel: | Nothing. |

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #4

Sgt. Pilya:    You stated that the dogs, uh, were charging that side door, uh,
               can you explain how they were doing that?

P.O. Abel:     They seemed to be wanting to stay on that patio part of the door, and you know
               the initial smaller dog is what caught me off guard, coming out the door, because
               I never seen the door open, uh, you know, I'm, I'm standing there covering the
               back door, and I hear a little noise on the back door, and then I kinda peek over to
               look, and that small dog jumped up on that door and it, it, startled me when, when
               it, I'm like, where the hell that dog come from, uh, and it was you know jumping
               up, being aggressive and all that, and then about the time he come out, I noticed
               that other dog and they were being aggre...they would approach and bark, you
               know I mean come up on that and back up, so they continued to do that the whole
               time.

Sgt. Pilya:    Did they actually jump up on the door; put their front paws up on the door?

P.O. Abel:     Not completely up, but they were coming at it, you know, the, the, smaller dog
               did like I said, that's what caught my attention it was that knock up on the door,
               and I'm like holy shit what's that.

Sgt. Pilya:    Okay.

P.O. Abel:     That got my attention.

Sgt. Pilya:    Okay.  Are you afraid of dogs?

P.O. Abel:     Am I...(laughing) if its growling I am.  Yeah.

Sgt. Pilya:    Have you ever been bitten by a dog?

P.O. Abel:     Yes.

Sgt. Pilya:    Uh, when was that?

P.O. Abel:     Uh, actually it, at work one day, you know, uh went on a run, just a smaller dog.
               Ladies like it's okay, it's okay, you know I always recommend put your dog up.
               Uh, no it's alright, it's alright, and then I kinda when I started talking to her just a
               small dog and it was biting my boots.

Sgt. Pilya:    Okay.

P.O. Abel:     Yeah no big deal, but...

Sgt. Pilya:    Have you ever shot a dog while on the job?

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #5

P.O. Abel:　　Shot at a dog, I don't know if I hit it.

Sgt. Pilya:　　Okay, and can you explain that circumstance a little bit?

P.O. Abel:　　Yeah, uh, towards the end of the day, uh, I, I, remember them seeing, uh, radio holding a run on High Street, it was uh, a run coming in and a guy said a dog was lose, uh, or I'm sorry, no, I, I, believe the run was uh, somebody's riding 4-wheelers in the alley and stuff so I thought, I can take care of that and head back to the sub. So I come back, go down the alley, a guy flags me down, yeah they're down there trying 4 wheelers and stuff in the alley, tearing up gravel. I told them, you know put that stuff up, uh, so, I, I, headed down that way, didn't see anybody, got out of my car, I, I saw a business where the, like a service gate or a big gate was open and I thought well let me walk, this is probably what he is talking about, let me walk in see what's going on. As I come out of my cruiser, and uh, head that way in the gate, here comes the dog, pit-bull, coming at me. (Laughing) I just backed, I didn't know where to go, drew my weapon, and it kept coming at me, and I fired at it.

Sgt. Pilya:　　But you don't know if you ever hit the dog?

P.O. Abel:　　Oh no, it, it, I fired, and it took off running, I don't know, they, they didn't see any blood or anything like that.

Sgt. Pilya:　　Okay. Is there any reason you would be more fearful of dogs then the average police officer? Is there anything in your past or anything like that, that…

P.O. Abel:　　No I don't think so.

Sgt. Pilya:　　…traumatized you…

P.O. Abel:　　I don't, I mean.

Sgt. Pilya:　　…to dogs?

P.O. Abel:　　My wife was a vet technician, you know she says look, look for signs. I also had a run where, uh, it was an 8 Alarm, and, uh, choppers overhead, me and my partner get out of the car and start to approach on an 8 Alarm, and they hey there's dogs coming from around the side of the house, and it was a Rottweiler, and you know, big dog, could do some damage, and uh, I, I, we were in the gravel driveway, I picked up some rocks, hey stop, and for some reason the dog stopped, you know, there just, they're unpredictable, but I know not to trust them.

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #6

| | |
|---|---|
| Sgt. Pilya: | Okay.  When you ordered the suspect to back up to the opening at the top of the side door to be handcuffed, what was your thought process?  How did you plan on handcuffing him at that time? |
| P.O. Abel: | I didn't have that, I wasn't really thinking that, I was just thinking controlling, uh, you know, bring him to me, I don't want to go anywhere near that area, the dogs are already being aggressive, just bring him to me and try to control him, that's what I was thinking. |
| Sgt. Pilya: | Okay and you stated again that the dog started charging the door again at that time.  Were they jumping up on the door at that time? |
| P.O. Abel: | No, not at that time, but it was a continuous approach where they would catch your eye barking and you know stand by his side and stuff like that. |
| Sgt. Pilya: | Okay.  So in your opinion they were being protective of their owner? |
| P.O. Abel: | Yes. Yes. |
| Sgt. Pilya: | When you first drew your gun, how were you positioned and where exactly did you position your firearm? |
| P.O. Abel: | I was down, on the, with my feet on the ground, and I positioned it towards the dogs, in that direction. |
| Sgt. Pilya: | Okay.  How tall are you? |
| P.O. Abel: | 5'6" with boots on. |
| Sgt. Pilya: | (Laughing) 5'6" with boots on.  Okay and in looking at that door the, the, plywood came up probably three-fourths (¾'s) of the way of the door.  Is that correct? |
| P.O. Abel: | Yes, that's that... |
| Sgt. Pilya: | And it had an open window? |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | So if you're pointing your gun at chest height at the dogs, would it have been... could you have seen the dogs doing that with the board there? |
| P.O. Abel: | I'm mean, I can see, I can see them coming, Yeah. |
| Sgt. Pilya: | They would be in.... |

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #7

P.O. Abel:     Yeah.

Sgt. Pilya:    You could see them in the distance, were they further back from the door?

P.O. Abel:     Yeah you see, like I said, you'd see them it's, it's like they didn't want to leave
               that patio though, they would back off and then they would come up and, and be
               aggressive, but they didn't, they didn't go far.

Sgt. Pilya:    Okay, but your firearm was on your side of the door?

P.O. Abel:     Yeah.

Sgt. Pilya:    It wasn't through the window?

P.O. Abel:     No.

Sgt. Pilya:    Okay. On page number 8 of your statement, you explained, at one point, you
               moved to the right of Officer Fulwider and pointed your weapon at the white dog.
               How exactly did you do that?

P.O. Abel:     Well I was...I was watching that dog. My focus was on that dog, when Doug was
               on the fence dealing with him.

Sgt. Pilya:    Okay, again were you standing on something, or how were you pointing your
               weapon at the dog with the board being that high? I'm just a little confused as
               how you would be aiming at the dog with, with your gun, were, were you, like
               extending your gun above your head or...

P.O. Abel:     No, not that I know of. I remember, I remember seeing the dog, I remember
               seeing the dog.

Sgt. Pilya:    Is it that you were looking at the dog, but you actually weren't pointing at the dog
               you just had your gun out, in readiness, is that be more....

P.O. Abel:     It, it could have been. I had it ready, you know, pointing it at, in that direction
               concerned about the dog.

Sgt. Pilya:    Okay. When Officer Fulwider stated that the suspect was not secured, or that the
               cuffs were not on right, could you see if either of the suspect's hands, uh, had a
               handcuff attached to it, you know?

P.O. Abel:     I, I could not see that, I could not see any of that.

Sgt. Pilya:    Okay. Would you say the suspect was actively resisting his arrest at that point?

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #8

P.O. Abel: I would say so, we, we never, we never, completely had control. He was talking the whole time, like trying to get our mind off of things, you know several officers said, you know, control your dogs, control your dogs. Uh...

Sgt. Pilya: What was he saying?

P.O. Abel: Uh, saying, he, he was saying uh, cause I think I even mentioned something about if those dogs come near me shoot them and he, "Don't shoot my dog, don't shoot my dog, I ain't doing anything," you know just kinda double talking, "I ain't doing anything, what, what's going on? You know I didn't do anything," uh duh, things like that.

Sgt. Pilya: Okay. Did the suspect ever strike you or any of the other officers during this incident?

P.O. Abel: No.

Sgt. Pilya: Could you explain how he was resisting?

P.O. Abel: Well even, even, when, when I had thought I put hands on him and stuff, it just slow to cooperate, not completely putting his hands where you want him to and things like that, just, you, you could sense that he didn't want to go along with the program.

Sgt. Pilya: So it was more passive?

P.O. Abel: Yeah, it wasn't, it wasn't anything, you know, like pulling away, or punching, or throwing an elbow or nothing like, but it was...

Sgt. Pilya: That's what I was getting at, Okay.

P.O. Abel: Yeah the double talking and, you, you could tell he just wasn't completely cooperating.

Sgt. Pilya: Okay, um, you stated that you then pulled yourself back up on the boarded door where Officer Fulwider was already leaning over the door. Can you explain how you pulled yourself up and, and how you were positioned in relation to Officer Fulwider?

P.O. Abel: I just got...

Sgt. Pilya: Was he already in the door?

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #9

P.O. Abel:      Well I just got climbed back up on the fence, you know what I mean? I, I, pulled
                myself back up felt like, you know Doug was having some trouble with him,
                maybe I need to try to control him a little bit.

Sgt. Pilya:     When you say pull yourself up on the door, how do you mean that?

P.O. Abel:      Just with my left hand I grabbed and pulled myself up on the fence.

Sgt. Pilya:     You're not standing on anything at that time?

P.O. Abel:      Uh, well, I'm pulling myself, yeah, standing on the fence, cause I can't get all the
                way up and stand on the ground.

Sgt. Pilya:     Okay.

Atty. Byard:    And by fence, I think he means obviously the door, yeah.

Sgt. Pilya:     The door.

P.O. Abel:      Yeah.  Yeah.

Sgt. Pilya:     You then grabbed the suspect's right hand, with your left hand.  What position
                was the suspect's right hand in at that time?

P.O. Abel:      Behind his back.

Sgt. Pilya:     It was behind his back?

P.O. Abel:      Behind his back.

Sgt. Pilya:     Okay, so when he initially came back to the door, he backed up to the door, you
                guys had him put his hands on top of his head, is that right?

P.O. Abel:      To control him up there.

Sgt. Pilya:     To control him, Okay.

P.O. Abel:      And I think we was even considering to try and cuff him up there to get some type
                of control…

Sgt. Pilya:     Okay.

P.O. Abel:      …of him, some type of control and…

Sgt. Pilya:     But he was cuffed up there?

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #10

| | |
|---|---|
| P.O. Abel: | ...and go from there.  He never was. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | And I thought I remembered Sarge saying, cuff him in the back. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | Cuff him in the back, I had control of him up here, K, and then I'm turning around to look to get to my cuffs and I looked down and Doug's got his cuffs already out. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | And that's kinda when I kinda, well you know, I already fumbled with my taser and dropped my taser, you got cuffs out, well, I kinda gave way to Doug to climb up there. |
| Sgt. Pilya: | Did you let go of him? |
| P.O. Abel: | No, No, No, No, No. |
| Sgt. Pilya: | You still had a hold of his hand? |
| P.O. Abel: | Yeah, Yeah, I held him till Doug got up there. |
| Sgt. Pilya: | Okay and then he didn't get a chance to put the handcuffs on; did the suspect pull his arms down?  Where did his arms go from being up behind his head? |
| P.O. Abel: | I think from there, when Doug took over, you know, I'm trying to give Doug room and coming down off the fence, and uh, that's when Doug was trying to get him away from the fence and get him this way. |
| Sgt. Pilya: | So you let go of him? |
| P.O. Abel: | Well, it wasn't like a let go and he's free, it was Doug kinda take over control and him try to handcuff him, I gave way to Doug. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | To do what I started to do. |
| Sgt. Pilya: | And that was when you went around. |
| P.O. Abel: | That's kinda when I dropped down and you know kinda get to the other side. |

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #11

| | |
|---|---|
| Sgt. Pilya: | Okay and then that's when you say you pulled yourself back up and you said, um, you grabbed the suspect's right hand with your left hand. |
| P.O. Abel: | Well he seemed like he was struggling with him and made that statement about, I don't have the cuffs on or they're not on right and uh, you know, I believe the Sarge made a statement about, try and pull him through the window, the door, try and pull him, you know and that's when I thought Doug needed some help. |
| Sgt. Pilya: | Okay that's getting ahead of us, let's, let's, let's go back to where, um… |
| Atty. Byard: | Is this, is this the point, this is what you're talking about?  Let's see, on page 8, uh second paragraph, first whole paragraph.  (Clearing throat) |
| Sgt. Pilya: | Yes, "I leaned over the door and I grabbed the suspect's right arm with my left hand to try and control him." |
| P.O. Abel: | Right. |
| Sgt. Pilya: | Okay, so I'm, I'm trying to figure out what the suspect was doing up to that point. So when Doug first took control of him, his hands are behind his head? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Correct? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Okay, but when we get to this point where you grabbed his right arm with your left hand, his arms were now down? |
| P.O. Abel: | Down. |
| Sgt. Pilya: | Okay, so uh, Fulwider was trying to cuff him behind his back? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Okay, was he doing that because Sergeant Griffis said to try that?  Is that your opinion? |
| P.O. Abel: | I think so. |
| Sgt. Pilya: | Okay. |

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #12

P.O. Abel:      I think so, because like I said we're thinking just get some type of control here, but then you know, I, I, you know then where do you go from there and then Sergeant Griffis, I believe, made the comment, cuff him in the back, but you know then you gotta, you gotta clear, you're giving him some clearance to try and do something like that. I think that's why Doug was struggling to try to get the handcuffs on him.

Sgt. Pilya:      Okay, so um, I'm trying; I'm trying to visualize how you guys have control of his arms behind his back, with that board being so high and the window being so high. Were you guys leaning halfway over the, the board?

P.O. Abel:      I don't, I don't, I, I, climbed like up here, up here.

Sgt. Pilya:      So his arms up, his arms up in the air?

P.O. Abel:      Yeah, yeah I am just trying to control, you know.

Sgt. Pilya:      Gotcha.

P.O. Abel:      And he makes that statement, you know I don't have the cuffs on or their not on right, that's, that's a big concern for me.

Sgt. Pilya:      Sure.

P.O. Abel:      He hasn't been patted down, I can't see much below his waistband, things like that, the dogs are approaching, I gotta be concerned about them, it was more like, you know I'm up on it, and I'm just trying to, you know, hang on, until we can figure out something else to do.

Sgt. Pilya:      Okay, so for the tape recorder, the tape recorder can't see what you just showed me, so I'm going to try and explain that okay?

P.O. Abel:      Okay.

Sgt. Pilya:      So the suspect had his right arm bent at the elbow and the elbow was pointing up and you had your arm through that trying to get control of that right arm, is that correct?

P.O. Abel:      That's correct, that's correct; just control him as much as I can.

Sgt. Pilya:      Okay, all right. At this point, you described the dogs jumping up at you, were they trying to bite you at that time?

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #13

| | |
|---|---|
| P.O. Abel: | I don't think, you know, enough to, but yeah, I mean you know they were, they were being aggressive, barking, growling, approaching, backing up, I mean that was my concern. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | That was my concern. |
| Sgt. Pilya: | You then explained getting lower on the door to try and kick it open.  Please explain your positioning at, at that time? |
| P.O. Abel: | My positioning was still trying to control his arm and maybe just squat a little bit to get some type of leverage to try kick that, kick that door, cause we, it's not like I had checklist of okay when this happens we're gonna do this. |
| Sgt. Pilya: | No, I understand. I'm just trying to determine what happened in what order. |
| P.O. Abel: | Right, people were trying to come up with ideas, pull him through the window, cuff him this way, and you know I am thinking let's get that, see if I can get that door open, so I kinda just squatted down to get a little bit lower and just try to kick the daggone thing. And it wasn't coming. |
| Sgt. Pilya: | And at the time you were doing that you were on the right side of the door, correct? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Okay.  Where was Officer Fulwider, uh, while you were attempting to kick the door?  Is he still to your left?  Did he have the, the suspects left arm? |
| P.O. Abel: | No, No, I, I was up on the fence by myself by then. (in audible) |
| Sgt. Pilya: | Where did Fulwider go? |
| P.O. Abel: | He must of dropped down behind me or something. |
| Sgt. Pilya: | He had let go of the suspect, as he was trying to get his arms behind his back, he at some point let, let go and backed off? |
| P.O. Abel: | Well it, it was kinda more like he was struggling a little bit to try to control and I just felt like I need to get back up there and help him. |
| Sgt. Pilya: | Uh huh. |

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #14

P.O. Abel:        With that, then the idea of pulling him through, like I said somebody said might have been (cough) (inaudible) pulling through the window and when that didn't happen, uh, sometime between then I think he kinda just dropped off the fence and you know, while I was trying to control him, just holding him.

Sgt. Pilya:       Okay. You explained that you pulled yourself back up on door after the attempt to kick the door in had failed. Um, how did you go about doing that? Did you, were you, standing on anything at that time, were, again did you just pull yourself up with your, with your left hand?

P.O. Abel:        Uh, I don't understand that question.

Sgt. Pilya:       This is after you tried to kick the door, um.

P.O. Abel:        After I tried to kick on it?

Sgt. Pilya:       Uh huh.

P.O. Abel:        The door, fence thing?

Sgt. Pilya:       Yeah, you said, "I pulled myself back up," it's on the bottom of page 8, third sentence up from the bottom, **"I pulled myself back up on the boarded door to try to control the suspect."** Explain your positioning at that time?

P.O. Abel:        Well I was in, in the same position, I just kinda leaned back up, you know, like I said I squatted a little bit to kick it, when that wasn't working, I even believed I told somebody, hey if this thing comes open, that dog comes at me, shoot that dog and then you know, I just kinda leaned back up to try to, you know get more leverage of where I was at trying to get, you know over top of him.

Sgt. Pilya:       Okay and while this is all going on, you still have your gun in your hand?

P.O. Abel:        Yeah.

Sgt. Pilya:       In your right hand?

P.O. Abel:        Yes.

Sgt. Pilya:       Okay, uh, again at the bottom of page 8, you say that Officer Fulwider backed away from the door. Do you know why he did that? Was he trying to give you room or…

P.O. Abel:        If I had to guess, yeah, I mean, I think he was trying to give me some room, it was, it was tight. You know up there in that, in that position, you know, yeah.

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #15

| | |
|---|---|
| Sgt. Pilya: | Okay, and then you said you uh, you locked, uh, your left arm with the suspect's right arm, so you, you didn't do that again, it, it was in that position the whole time? |
| P.O. Abel: | Tha…Yeah, yeah that's correct, I never lo…I don't think at any time, once we went hands on (cough) at no time did we really relinquish co…semi, semi hands on with him.  Other than when Doug come up, it's more of like a change over, put the cuffs on and then even at there I maintained as much control as I could with him. |
| Sgt. Pilya: | Do you think it's possible that the suspect actually had cuffs on at the time that you were trying to get his arm behind his back? |
| P.O. Abel: | Is it possible? |
| Sgt. Pilya: | Uh huh. |
| P.O. Abel: | I think it's possible, yeah. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | At the time you fired your weapon, had you seen a weapon on the suspect's person? |
| P.O. Abel: | No. |
| Sgt. Pilya: | At the time you fired your weapon, did you see any weapons in close proximity to the suspect. |
| P.O. Abel: | Mine. |
| Sgt. Pilya: | Yours, okay. |
| Sgt. Pilya: | At the time you fired your weapon, where exactly were the dogs?  When your gun went off, where were the dogs? |
| P.O. Abel: | I don't remember seeing the dogs, when he pulled, I was so focused on the threat and him, I don't know. |
| Sgt. Pilya: | Okay, so they weren't right up in your face, they weren't right attacking you at that point? |
| P.O. Abel: | No. |

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #16

| | |
|---|---|
| Sgt. Pilya: | Okay.  At the time you fired your weapon, what was your target? |
| P.O. Abel: | Him. |
| Sgt. Pilya: | What part of him?  I mean you're in close proximity with him. |
| P.O. Abel: | Well I mean. |
| Sgt. Pilya: | Aiming for a certain part of his body? |
| P.O. Abel: | Uh, just thinking center mass, you know, he, he's pulling, I feel like I'm going over, raise the gun and stop the threat. |
| Sgt. Pilya: | Okay.  At the time you fired your weapon, how far away from the suspect would you say the end of the barrel of your firearm was? |
| P.O. Abel: | Aw, maybe a couple feet. |
| Sgt. Pilya: | Couple feet?  Okay. |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | And do you recall what your back-drop for your shots were? |
| P.O. Abel: | Well the house, the door. |
| Sgt. Pilya: | The house? |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | Okay so, um, um, I'm just a little confused here, um, so as I understand it at, at this time, you had your left arm locked with his right arm. |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | His right arm's in that chicken wing position, up in the air again, right? |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | And you had your gun in your right hand, right? |
| P.O. Abel: | Yep. |

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #17

| | |
|---|---|
| Sgt. Pilya: | And you're being pulled through the window by the suspect, when he lunges forward, you're being pulled through the window.  Is that correct? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | And you have your gun in your right hand? |
| P.O. Abel: | Yep. |
| Sgt. Pilya: | Okay, so when you fired, would the gun have been facing to your left? |
| P.O. Abel: | No, I don't think so. |
| Sgt. Pilya: | Do you see what I'm saying?  You got the guy here, he's pulling you forward. |
| P.O. Abel: | Right. |
| Sgt. Pilya: | Where was your gun facing?  Where, where was the barrel pointing?  If it was pointing at the house, it, it's over this way, right? |
| P.O. Abel: | Right. |
| Sgt. Pilya: | So when you fired the gun, did you still have a hold of the suspect?  Cause that's kinda the way it reads. |
| P.O. Abel: | I don't. |
| Atty Byard: | Yeah, I mean. |
| Sgt. Pilya: | Do you understand where I am getting at? |
| Atty Byard: | I do. I, I think an obviously, I wasn't there, but if you have your left in his right chicken wing. |
| Sgt. Pilya: | Uh huh. |
| Atty: Byard: | And he goes off in an angle, and, your, your back drop will be alongside of the house right? |
| Sgt. Pilya: | But he's pulling him through the window at that time. |
| Atty: Byard: | Right, Right. |
| Sgt. Pilya: | Right? |

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #18

Atty. Byard:  Right.

Sgt. Pilya:  So did he pull you towards the house, through the window?

P.O. Abel:  Well he, he dove in that direction.  Dove in that direction and that the kind where I was led to.  Cause when it, when it was all, all done with that's the direction I ended up.  Shoulder to shoulder with Dungey.

Sgt. Pilya:  Okay.  And you fired two (2) shots right?

P.O. Abel:  Yeah, I believe I did, two (2) shots.

Sgt. Pilya:  Okay, did you fire those at one after the other in rapid succession or was it pop, a pause and another fire?

P.O. Abel:  No, it seemed like to me, it was like double tap, pop, pop.

Sgt. Pilya:  Okay.

P.O. Abel:  That's what it seemed like to me.

Sgt. Pilya:  Both in the same direction?

P.O. Abel:  Yeah.

Sgt. Pilya:  Okay.

P.O. Abel:  Yeah.

Sgt. Pilya:  At the time you fired your weapon, where did you believe the other officers were positioned?

P.O. Abel:  Well I never did see Sarge, but I could hear him behind me, uh, I assumed or I thought maybe Fulwider was kinda behind me and then Dungey was to the right of me.

Sgt. Pilya:  Okay.  And did you fire your gun prior to Officer Dungey attempting to deploy his taser?

P.O. Abel:  I, I don't know.

Sgt. Pilya:  Do you recall hearing the pop of the taser or anything like that?

P.O. Abel:  Uh, uh…

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #19

| | |
|---|---|
| Sgt. Pilya: | Okay, (clear throat) so just to be clear, at the time you fired your weapon, you were firing it at the suspect and not the dogs, is that correct? |
| P.O. Abel: | Correct. |
| Sgt. Pilya: | Okay.  Were you firing your weapon at the suspect due to his attempting to flee back into the house? |
| P.O. Abel: | No. |
| Sgt. Pilya: | Okay.  When you were at the front door and a brown dog charged you, explained the dog's actions at that time? |
| P.O. Abel: | When we went back around? |
| Sgt. Pilya: | Uh huh. |
| P.O. Abel: | Once he made it inside, uh, I was kinda, kinda fuzzy from the whole thing, uh, Doug did a good job taking control, open, jerked that door open and everything and he said, "Hey you got my back," forced open the door and here's that little brown dog charging at us again. |
| Sgt. Pilya: | So how close did the dog get to you guys? |
| P.O. Abel: | Mmm, I say maybe about four (4) feet. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | Coming across the living room towards that door. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | When we were coming in. |
| Sgt. Pilya: | Was he barking and snarling? |
| P.O. Abel: | Yeah. Barking and stuff, being aggressive, barking and you know I thought, you know shoot it coming at us that way and uh. |
| Sgt. Pilya: | Why didn't you shoot it? |
| P.O. Abel: | Because, it just turned around and ran, ran away, and then I never seen it again. |
| Sgt. Pilya: | Okay.  Other than those mentioned in your statement, did the suspect make any other during this incident? |

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #20

P.O. Abel:      Did the suspect?

Sgt. Pilya:     Uh, huh.

P.O. Abel:      Uh, yeah when he, when, uh, Doug pulled him to the front door, he was saying something about, **"I'm bleeding,"** you know things like that, uh other than that didn't make any, make any statements.

Sgt. Pilya:     Okay. Uh, you now know the identity of the suspect as **JAMES ENGLAND**, have you had any previous contact, personal or professional, with Mr. England?

P.O. Abel:      Yes.

Sgt. Pilya:     And what were those occasions?

P.O. Abel:      Uh, I had an occasion with him being a suspect on a burglary. Detective Bowen put out some information, I believed during the summer, uh, where, where a retired officer that lived in the Pines, his father-in-law observed him, uh, trying to break into a house or coming on his property and stuff. He confronted him and they had little bit of a verbal confrontation and uh, the retired officer was able to get the tag and that's who it came back to, so that was one (1) incident.

Sgt. Pilya:     But did you have any contact with him personally during that? Did you arrest him out of that burglary?

P.O. Abel:      I didn't.

Sgt. Pilya:     Or...

P.O. Abel:      I didn't. Uh, I remember one (1) day that I was, it was on my mind. I was looking for something to follow up on that, maybe watch him, find out this other address on Dolby where he stays. (Coughing) Was coming down High Street, uh to turn on Alcott to go to Dolby one day, and I'm looking over and I see him pulling out of the gas station on the corner, make eye contact with him, he was pulling out in a burnt orange Chevy Avalanche, and I'm there he goes right there, that's him right there.

Sgt. Pilya:     Okay.

P.O. Abel:      That, that's one incident, another incident, uh, I seen video of him beating on his wife or his girlfriend over on Koebel, uh, he was throwing rocks at his dad and stuff like that.

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #21

| | |
|---|---|
| Sgt. Pilya: | Do you know how we can get a copy of that video, do you know who was in possession of that or what case that was? |
| P.O. Abel: | Fulwider. |
| Sgt. Pilya: | Fulwider. Okay. |
| P.O. Abel: | Fulwider had (inaudible) |
| Sgt. Pilya: | We're gonna need to get a copy of that. |
| P.O. Abel: | Okay. |
| Sgt. Pilya: | Okay. Have you ever been involved in a Police Involved Shooting before? |
| P.O. Abel: | No. |
| Sgt. Pilya: | Okay, Detective Kestner, any other questions? |
| Det. Kestner: | No, sir. |
| Sgt. Sicilian: | I do have a couple. Okay, Keith I'm gonna, will back, I'm gonna back up to a kinda the dialogue between you and the suspect. |
| P.O. Abel: | Okay. |
| Sgt. Sicilian: | So you had some dialogue? |
| P.O. Abel: | Hmmm uh. |
| Sgt. Sicilian: | So my question is, and you mentioned some of the dialogue in your statement at the different points in terms of your contact with him. |
| P.O. Abel: | Okay. |
| Sgt. Sicilian: | Collect, what was your collective assessment of his verbal queues, was he, was he trying to cooperate with you, or was he not trying to cooperate with you? |
| P.O. Abel: | Well I've, I've had that done before in, in my opinion he was not cooperating with us, where people will try, even on traffic stops, they try to double talk ya, or get your mind off of what you're doing so they can get the upper hand on ya, and it's just. |
| Sgt. Sicilian: | Like stalling? |

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #22

P.O. Abel: Yeah, yeah, he, he, he's, he's stalling, he's buying his time, we're saying, officers are mentioning, put them dogs up, uh, is anybody inside that can take control of the dogs, and it's just, yea, stalling and double talking and you know.

Sgt. Sicilian: So.

P.O. Abel: In, in my mind, I don't trust that, you know, it there's no way, do, do I trust him.

Sgt. Sicilian: So collectively, so if you had to say an absolute, was he cooperative or not?

P.O. Abel: I say no.

Sgt. Sicilian: Okay.

P.O. Abel: No, at, at no time was he cooperative and at no time did I feel like we had control of him.

Sgt. Sicilian: Okay, that does, that leads to the, the other, another question I had. Did you feel you ever had control of the suspect throughout from the start of the, of the incident?

P.O. Abel: No.

Sgt. Sicilian: Did you ever feel you had control of it?

P.O. Abel: No, no, I was in a bad position the entire time.

Sgt. Sicilian: At the point you gave way to Officer Fulwider, first of all what's Officer Ful, what's his, his stature? Do you know how tall he is?

P.O. Abel: Uh...

Sgt. Sicilian: Is he bigger than you?

P.O. Abel: Everybody's taller than me, but maybe a few inches, he's probably.

Sgt. Sicilian: Is he stronger than you?

P.O. Abel: He's maybe 5'10". Uh, yeah I would say, he, he gra, does that Ju-Jitsu wrestling stuff.

Sgt. Sicilian: So you gave way to him to, so he could try to control the suspect?

P.O. Abel: Yes.

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #23

Sgt. Sicilian:     Did you have control of him at that point?

P.O. Abel:        If you call me leaning over with hands on top of his head control, I don't think so, no.

Sgt. Sicilian:     So you didn't feel you had control of him?

P.O. Abel:        No, No.

Sgt. Sicilian:     So you gave him to the other officer?

P.O. Abel:        Yes. When I looked over and Doug had his cuffs out, like I said I already fumbled with my taser trying to put it in, I dropped it and I just, he had his cuffs out so I kinda like, you know, go get him Doug.

Sgt. Sicilian:     You felt he had a better opportunity to try and control him better?

P.O. Abel:        Yeah.

Sgt. Sicilian:     Is that why you gave well?

P.O. Abel:        Yes. Yeah.

Sgt. Sicilian:     Okay.  Another issue, you had a history, some history with the suspect.

P.O. Abel:        Yeah.

Sgt. Sicilian:     In that history and I didn't hear it mentioned, so I just want to try and clarify, was there any violence that you know of?  I know domestic violence incident, but any violence in terms of weapons, in terms of assaults on officers, in terms of his demeanor towards officers, or his perspective on police officers?

P.O. Abel:        Well even, even Sarge mentioned, I think Sarge dealt with him at the, at the hospital out of that incident and said, "Hey that's a violent dude," he, he, he even said that when, when he seen me pull the picture up and all that, that's a violent dude and a, the other thing is uh, I knew that Detective Adrovet, Jaime, was looking into him for narcotics activity and if, you know, they was saying he was putting a GPS on his car, or they were in the process of putting a GPS on his car, he even had me, wanted me to drive by one day and try to get a tag, I said yeah, no he's driving that burnt orange, uh, Avalanche, Jaime goes, "No, he's driving a different car now, I know about that one, can you get me the tag on the other car," and I never did get that for him, but you know, I, I've been doing this 18 years, if narcotics is looking into ya, you're not standing on the corner selling weed.

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #24

Sgt. Sicilian: So what is your sense or your experience, what does it suggest people who deal in narcotics? Do they typically have weapons?

P.O. Abel: Just about all the time.

Sgt. Sicilian: So.

P.O. Abel: It, it, it goes hand and hand. I've been on the street a while it goes hand and hand, whether it's a traffic stop, somebody dealing out of a house or anything.

Sgt. Sicilian: Okay.

P.O. Abel: Cause they're very dangerous.

Sgt. Sicilian: In, in all this information you had prior to firing the shots?

P.O. Abel: Yes, Yes.

Sgt. Sicilian: Could you clarify one more time for me please, it's not clear to me, when did you pull your gun out?

P.O. Abel: When I, I raised my gun when I felt him pulling me over the fence.

Sgt. Sicilian: So what was your fear when you pulled your gun out?

P.O. Abel: It scared the hell out of me.

Sgt. Sicilian: What, what, what in your mind if you got pulled into his area...

P.O. Abel: Uh huh.

Sgt. Sicilian: On the other side of that fence.

P.O. Abel: Yeah.

Sgt. Sicilian: What were, what, what were the various things that would have caused you a problem with danger?

P.O. Abel: Uh.

Sgt. Sicilian: On the other side.

P.O. Abel: I mean, like Sarge asked me, my guns in play.

Sgt. Sicilian: Uh huh.

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #25

**P.O. Abel:**   I mean, now all the sudden I gotta take a, whatever foot fall to concrete and then wrestle this guy with my gun, he, uh, I'm concerned, you know, I ain't going down like that, you know, he's pulling me over, it's gonna be a fight for my gun, not to mention the dogs, um, you know, I didn't, I, I, I never seen what, what Dungey had in his hand, turned out he had a taser in his hand, you know, that, that's hindsight and I didn't know it at the time, but you know the fatal funnel being in that doorway bothered me, my tension was kinda all over the place, him, the dogs, the fatal funnel of the door, is anybody else inside, is somebody going to come to the door, open the door and just blast all of us, so that was a lot on my mind.

**Sgt. Sicilian:**   So, so when you fired your shot, based upon what you were saying, were you stable on the ground or were you still kinda falling?

**P.O. Abel:**   That's the thing, it, when I raised the gun I went from up on the fence, I felt like I was going down, falling down.

**Sgt. Sicilian:**   So you, when you fired your shot, you felt, you like, you were falling into that area?

**P.O. Abel:**   Yes.  Yes.

**Sgt. Sicilian:**   Okay and you fired immediate the second shot?

**P.O. Abel:**   Yes.

**Sgt. Sicilian:**   Simo, simultaneous or right immediately after that first one?

**P.O. Abel:**   Yeah to me it was tack, tack. I, I didn't even, even afterwards, I didn't even realize how many shots I, I fired.

**Sgt. Sicilian:**   So when, when did you feel yourself stable on the ground?

**P.O. Abel:**   Kinda after it was all done with.

**Sgt. Sicilian:**   Okay.  Another one, one other question, so when you fired your shot, you said (cough) you could, could, could you see both of his hands when you fired your shot?

**P.O. Abel:**   No, No.

**Sgt. Sicilian:**   Did you ever see if he had anything in his waistband or could you assess that?

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #26

P.O. Abel:     Never had an opportunity to really assess, you know, what was below like waist level.

Sgt. Sicilian:     Okay.

P.O. Abel:     Or even, even chest level, you know, uh, I'm not, I didn't wanna really lean over and peek.

Sgt. Sicilian:     So you went into this incident or this confrontation, the eventual confrontation thinking the suspect had access to weapons?

P.O. Abel:     Yes.

Sgt. Sicilian:     Thinking he was armed, potentially at the time?

P.O. Abel:     Yes.

Sgt. Sicilian:     Or there was a likelihood?

P.O. Abel:     Likelihood, Yes, yes, I would say so.

Sgt. Sicilian:     And you could, couldn't see both of his hands when you fired your shots?

P.O. Abel:     No.

Sgt. Sicilian:     Okay and let's see, do you believe you had any other option when you fired your shots?

P.O. Abel:     No, No.

Sgt. Sicilian:     When you fired your shots, who were you protecting? Yourself?

P.O. Abel:     I think I was protecting myself and the other officers, if he get access to my gun, I, I don't, you know, even somebody carrying the taser they're in trouble.

Sgt. Sicilian:     Okay and then one other question, the, where was the other officer in relation to where you were at the time you fired?

P.O. Abel:     Which officer was that?

Sgt. Sicilian:     The uh...

P.O. Abel:     Dungey?

Sgt. Sicilian:     Dungey, the officer who fired the taser or...

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #27

| | |
|---|---|
| P.O. Abel: | See I, when, when, when he's pulling me and I'm going down, I felt him as I'm coming down, almost like butt shoulders with me, as we're coming to that point, for him to address the threat and for me to uh, you know, stabilize myself. |
| Sgt. Sicilian: | Do you think he saw what you saw at that point and time? |
| P.O. Abel: | I'm not sure, I'm, you know, I'm not sure what, what, he saw, I mean I was so focused on, when I'm going over and he's pulling, I had that raise the gun and stop the threat. |
| Sgt. Sicilian: | Okay.  I don't have any other questions thanks. |
| Sgt. Pilya: | Okay let's go over the sketch.  This is a sketch that was um, created by our Crime Scene Search Unit, um, right here you can see the compass points. |
| P.O. Abel: | Okay. |
| Sgt. Pilya: | So if I ask you for a directionality use this.  Okay? |
| P.O. Abel: | Alright. |
| Sgt. Pilya: | I'm gonna actually turn it upside down, cause when I was looking at it I think this is probably the best viewpoint for you, um, this would be the suspect's house's driveway. |
| P.O. Abel: | Right, right that makes more sense. |
| Sgt. Pilya: | And this would be the side door, this is the back door to the house that had the dog door in it. |
| P.O. Abel: | Uh huh. |
| Sgt. Pilya: | Okay, you got yourself where your head is with it? |
| P.O. Abel: | Yep. |
| Sgt. Pilya: | Okay, does this look like a fairly accurate depiction of the scene as you recall it? |
| P.O. Abel: | Yeah, yeah, pretty much. |
| Sgt. Pilya: | Okay, I'm going to give you the red pen here, and basically what I would like you to do, is put an "X" where you were when you fired your weapon.  Where you believed you were when you fired your weapon. |

Ex. B

Audio-Recorded *Formal Statement* of: Officer Keith Abel
March 3, 2015
Page #28

| | |
|---|---|
| P.O. Abel: | Well this was close, but where I was when I fired? |
| Sgt. Pilya: | Uh huh. |
| P.O. Abel: | Somewhere right about here. |
| Sgt. Pilya: | Okay and could you put an "S" where you believe the suspect was at the time you fired your weapon? |
| P.O. Abel: | Put and "S"? |
| Sgt. Pilya: | "S". |
| P.O. Abel: | Probably somewhere here. |
| Sgt. Pilya: | Okay, and were you in the same position when you fired your second round? |
| P.O. Abel: | I, I don't, I don't think I was cause I was falling in this direction. |
| Sgt. Pilya: | Okay so you were actually falling in between your first and second shot? |
| P.O. Abel: | Yeah I believe so, I believe so. |
| Sgt. Pilya: | Okay and you were falling westbound, towards the house? |
| P.O. Abel: | Towards the house. |
| Sgt. Pilya: | Okay and was the suspect in the same position when you fired your second round? |
| P.O. Abel: | Probably not cause it was all happening so fast, he was diving, pulling, trying to get away. |
| Sgt. Pilya: | So you believe he would have been a little bit further westbound for the second shot? |
| P.O. Abel: | Yeah I think so, I think so. |
| Sgt. Pilya: | Okay and you, you've explained a couple times here that uh, Officer Dungey would have been directly west of you, right beside you? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Okay and that Officer Fulwider and uh, Sergeant Griffis would have been some place behind you, to the north? |

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #29

| | |
|---|---|
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Is that correct? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Okay, and at the time you fired, you don't recall where the dogs were in here at any place? |
| P.O. Abel: | Uh, uh, once, once he (cough) started pulling, I just, was so focused on what I was doing and stopped the threat. |
| Sgt. Pilya: | Okay and when you fired your weapon, both rounds you'd say you were firing in a, uh, westerly direction, westerly, south westerly? |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | Okay. |
| P.O. Abel: | Yeah. |
| Sgt. Pilya: | Anything else? |
| Atty Byard: | No, sir. |
| Sgt. Sicilian: | Sorry, one more, when Sergeant Pilya asked you when you fired your shot (cough) in terms of what the sus, what the, what was the suspect doing and you said he, you fired, not because he was gonna flee.  Correct? |
| P.O. Abel: | Correct. |
| Sgt. Sicilian: | What did you think he was gonna do, the suspect that is? |
| P.O. Abel: | I thought he was just pulling me down, diving down, to pull me over the fence and get advantage or even reach for a weapon or anything, I mean that's kinda what I had in mind. |
| Sgt. Sicilian: | Okay. |
| P.O. Abel: | I, I, I had no idea that he was trying to run through a doggy door. |
| Sgt. Sicilian: | Okay. |

Ex. B

Audio-Recorded *Formal Statement* of:  Officer Keith Abel
March 3, 2015
Page #30

| | |
|---|---|
| Sgt. Pilya: | Go ahead and sign this down there at the bottom.  Your name, badge number, and today's date. |
| P.O. Abel: | Right here? |
| Sgt. Pilya: | Yeah, that's fine. |
| P.O. Abel: | (signing) |
| Sgt. Pilya: | Is this statement true, to the best of your knowledge? |
| P.O. Abel: | Yes. |
| Sgt. Pilya: | Do you wish to add or change anything in the statement at this time? |
| P.O. Abel: | No. |
| Sgt. Pilya: | This will conclude this interview.  The time is now 8:54 a.m. |

***   **End of Audio-Recorded Statement of Fact**   ***

:af
3/13/2015

Ex. B



Not to Scale

| Offense: Police Involved Shooting | Location: 2756 Dolby Dr. | | Date: 2/06/2015 |
|---|---|---|---|
| Investigator: Det. M. Kestner 1827 | Drawn By: C.S.S.U. Det. L. Shoaf 1217 | | Approximate Scale in Feet: 0    5    10 |

Ex. B