# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**JAMES J. ENGLAND,**

          **Plaintiff,**        **:**

    **v.**                         **Case No. 2:19-cv-1049**
                                  **Judge Sarah D. Morrison**
                                  **Magistrate Judge Kimberly A.**

**CITY OF COLUMBUS, OHIO,**      **Jolson**
***et al.,***                   **:**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on three motions. First, Defendant City of Columbus filed a Motion for Summary Judgment (City Mot., ECF No 39), to which Plaintiff James England responded (Resp., ECF No. 48), and the City replied (City Reply, ECF No. 46). Defendant Officer Keith Abel also filed a Motion for Summary Judgment (Abel Mot., ECF No. 38), to which Mr. England responded (Resp.), and Officer Abel replied (Abel Reply, ECF No. 45). Finally, Mr. England moved to strike new arguments raised in Officer Abel's reply. (Mot. to Strike, ECF No. 47.) Officer Abel responded (ECF No. 48), and Mr. England has filed a reply (ECF No. 49). All three motions are now ripe for consideration. For the reasons set forth below, Mr. England's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**; Officer Abel's Motion for Summary Judgment is **DENIED**; and the City's Motion for Summary Judgment is **DENIED**.

## I.    BACKGROUND

### A.    Factual Background

This suit centers on the arrest and shooting of James England by Columbus Division of Police Officer Keith Abel. Perhaps unsurprisingly, many of the facts are in dispute. Although the Court must construe all disputed facts in the light most favorable to the plaintiff, *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008), they are discussed from all relevant perspectives in the section that follows.

#### 1.    February 6, 2015 Incident

Officer Keith Abel first joined the Columbus Division of Police ("CDP" or the "Division") in 1996. (Abel Dep., 11:25, ECF No. 30-1.) On February 6, 2015, he was a first shift patrol officer in Columbus's Thirteenth Precinct. (*Id*., 15:20, 16:22.) That morning, Officer Abel reviewed the Division's daily bulletin and noticed a felony warrant for James England, a name he recognized. (*Id*., 28:16–24, 32:6–15.) Officer Abel decided to look into the warrant further and "actually attempt to go pick him up." (*Id*., 29:18–20.) After confirming that the warrant was valid, Officer Abel, Officer Douglas Fulwider, Officer Armando Dungey, and Sergeant Kenneth Griffis went to Mr. England's home on Dolby Drive. (*Id*., 39:24–40:4, 41:5–6.) At the home, Officer Abel "took up an observation spot" by the back door while the other three approached the front. (*Id*., 47:17–18.) Officer Fulwider then indicated to Officer Abel that Mr. England was inside and that they "were trying to get him to come out." (*Id*., 49:13–15, 54:5–8.)

What happens next can be understood only in context of the unique physical surroundings. The house is a one-story structure with an attached back patio. (ECF

No. 30-3, PAGEID # 380.) The patio has three doors: the back door to the house; a door opening into a yard enclosed by a six-foot privacy fence; and a door opening onto the driveway. (ECF No. 30-5, PAGEID # 393.) The patio was at one time screened-in, but all the screens have been removed. (*Id*.) The portions of the patio opening onto the yard remain open. (*Id*.) The portions opening onto the driveway are covered with plywood. (*Id*.) Although the panels next to the driveway door are boarded floor-to-ceiling, the door itself is boarded only part-way. (*Id*.) The plywood covering the door is roughly four and one-half feet high, leaving about a two-foot opening at the top. (England Dep., 68:12, ECF No. 31.) As a result, a person standing in the driveway can reach their arms into the patio. (ECF No. 30-5, PAGEID # 394.) The back door to the house is just a few feet from the plywood-covered door, on the perpendicular wall. (*Id*., PAGEID # 395.) The back door has a pet entrance, or dog door, cut into it. (*Id*.)

At his post by the plywood-covered door, Officer Abel drew his TASER. (Abel Dep., 57:19–24.) He heard a dog enter the patio and felt it jump up onto the plywood. (*Id*., 62:8–10.) At five-feet six-inches tall, Officer Abel did not have complete visibility into the patio. (*Id*., 59:22, 60:19–22.) However, shortly after he heard the dog, Officer Abel observed the back door open and "out comes Mr. England." (*Id*., 62:22–24.) Officer Abel then delivered loud verbal commands directing Mr. England to "stop." (*Id*., 70:2–3.) Mr. England complied. (*Id*., 70:5.) Officer Abel directed Mr. England to approach the door and put his hands up. (*Id*., 70:7–9.) Again, Mr. England complied. (*Id*., 70:19.) Officer Abel then "[went] hands-

3

on," securing Mr. England's hands in one of his own. (*Id.*, 71:6–72:5.) Although Officer Abel believes "'control' is kind of a strong word to use" to describe that moment, he acknowledges that he was "holding [Mr. England's] hands above his head." (*Id.*, 74:2–4.) Mr. England was not resisting Officer Abel's grasp. (*Id.*, 74:7.)

Officer Fulwider, Officer Dungey, and Sergeant Griffis heard Officer Abel's loud verbal commands and arrived in the back of the house to see Officer Abel "hands-on" with Mr. England. (Fulwider Int., 07:00, *see* ECF No. 42-1; Dungey Int., 03:30, *see* ECF No. 42-1; Griffis Int., 06:15, *see* ECF No. 42-1.[1]) Officer Fulwider joined Officer Abel in securing Mr. England in handcuffs. (Fulwider Int., 7:00; Abel Dep., 79:8–11.)

At this point, the first-hand accounts begin to vary. In Officer Abel's version of events, he stepped away from the door to "giv[e] [Officer Fulwider] some clearance to try and" get the cuffs on. (Abel Int., PAGEID # 361, ECF No. 30-3.) In doing so, he fumbled his TASER and dropped it. (*Id.*, PAGEID # 359. *See also* Abel Dep., 90:1–4.) Officer Abel then drew his service weapon and approached the door again. (Abel Dep., 92:23–24.) He heard Officer Fulwider say something to the effect of "He's not secure, I don't have him secure." (*Id.*, 95:16–17.) Officer Abel maintains that Mr. England "never was" handcuffed. (Abel Int., PAGEID # 359.)

According to Officer Fulwider, Mr. England "started squirreling, started pulling, twisting" when he tried to get the cuffs on. (Fulwider Int., 8:00.) Ultimately,

---

[1] Audio recordings of the Critical Incident Response Team ("CIRT") interviews with Officer Fulwider, Officer Dungey, and Sergeant Griffis were manually filed with the Court. (*See* ECF No. 42-1.) All timestamps are approximate.

Officer Fulwider "was able to get one handcuff on [Mr. England.]" (Porter Report[2], 2, ECF No. 42-2.) Together, he and Officer Abel got the second handcuff on—but "[Officer Fulwider] never got them locked, double-locked or anything." (Fulwider Int., 8:25.) After Mr. England was handcuffed, his two dogs, which Officer Fulwider believed to be large pit bulls, "came out onto the patio" and "were aggressive towards the officers." (Porter Report, 2.) "Officer Fulwider told Mr. England to order his dogs back into the house." (*Id*.) Mr. England complied, but only one dog retreated. (*Id*.)

According to Sergeant Griffis, Officers Fulwider and Abel were attempting, but struggling, to handcuff Mr. England over the plywood. (Griffis Int., 7:20.) He said that "Mr. England was hesitant or wasn't able" to control the dogs and was concerned about the dogs getting hurt. (*Id*., 8:30.) Officer Dungey reported that Officer Abel was putting handcuffs on Mr. England when he arrived in the back of the house. (Dungey Int., 3:30.)

For his part, Mr. England recalls "back[ing] up until both officers [presumably, Officers Fulwider and Abel] had both hands on both of [his] wrists, and they put – placed [him] in handcuffs. . . . [A]t that time it was two officers back there. One was more in charge because he was giving the other one orders as far as 'Hold his hand. I'm stepping up on this. I am going to pull him over,' so forth, so

---

[2] CIRT Detective James Porter interviewed Officer Fulwider immediately after the shooting. Though the audio recording of this interview was manually filed with the Court (*see* ECF No. 42-1), Detective Porter also prepared a written summary (ECF No. 42-2).

forth." (England Dep., 39:2–11.) It was only when the "officers had [him] fully handcuffed" that his dogs came out onto the patio. (*Id.*, 39:12–14.) Mr. England recalls an officer giving "the command to go ahead and kill the dog," and pleading for their safety. (*Id.*, 40:10–21.)

Around this time, the officers tried to extract Mr. England from the patio through the opening at the top of the door. (Abel Dep., 94:7–16.) Officer Abel stood on "something" next to the door, "locked onto [Mr. England's] arm" and, with Officer Fulwider, tried to lift Mr. England—a five-foot nine-inch man weighing one-hundred eighty pounds with his arms pinned behind his back—off the ground and over the four-foot six-inch piece of plywood he and the officers were standing against. (*Id.*, 94:12–22, 98:16–25. *See also* ECF No. 30-7, PAGEID # 399.) Soon after this effort began, Officer Fulwider let go of Mr. England and "grabbed ahold of [Officer Abel's] gunbelt to stabilize him as he went to pull [Mr. England] up." (Fulwider Int., 10:40.) Officer Abel was "up in the threshold of [the plywood-covered door], holding onto" Mr. England with his left arm, while holding his service weapon "at the low ready" with his right. (Abel Dep., 106:10–11, 108:19–20.) Officer Abel then "felt [his] weight going over the patio door and onto that patio – onto that concrete." (*Id.*, 109:8–10.) He "thought [Mr. England] was trying to take [him] out"—that Mr. England had "lunge[d], trying to pull [Officer Abel] over the patio door." (*Id.*, 109:4–5, 12–13.) Officer Abel "aimed [his] gun and fired two shots at [Mr. England]." (*Id.*, 112:11–12, PAGEID # 346.)

Mr. England remembers the shooting differently:

The next thing it just happened so quick, you know what I mean? The next thing I remember I was being pushed forward, and I was shot. As soon as I heard the gunshot, both the dogs, they locked up. They . . . shot through the doggy door. When they shot through the doggy door, it was an instant. I heard the gunshots, boom, boom. My dogs are running.

As soon as I seen the dogs go for the doggy door, I'm already in handcuffs, but I'm scared to death, so I shoot for the dog door too. I shoot for it.

(England Dep., 41:2–13.)

As Mr. England dove through the dog door, Officer Dungey deployed his TASER to prevent the escape, unaware that Mr. England had been shot. (Dungey Int., 14:05.) The officers found Mr. England on the floor inside the house, bleeding, with his hands cuffed. (Porter Report, 2–3.) Medics were called to the scene. (*Id.*, 3.) Mr. England was taken into custody and transported to the hospital. (ECF No. 31-6.)

Officer Abel "never felt like [Mr. England] was absolutely compliant," though does not say precisely why. (Abel Dep., 117:18–19.) But save for the "lunge," Officer Abel concedes that Mr. England engaged in no active resistance. (*Id.*, 117:22–118:24.)

## 2.    Division Policies and Procedures

CDP Directive 2.01[3] governs the use of force by personnel. (Directive 2.01, ECF No. 42-9.) The directive recognizes eight "levels" of force, ranging from officer presence to deadly force. (Directive 2.01, § I.B.) As relevant here, deadly force may

---

[3] The Division's Directive on Use of Force was at one point renumbered from 3.25 to 2.01. (*See* Shaw Dep., 68:17–69:4, ECF No. 42-11. *Compare* Directive 2.01 *with* ECF No. 30-12.) The record contains a document titled "Columbus Police Division Directive 2.01—Use of Force, revised June 30, 2014. (Directive 2.01.) To avoid confusion, the Court references the relevant directive only as 2.01.

only be used "when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm," or "to prevent escape when there is probable cause to believe that the suspect poses an *immediate* threat of serious physical harm to himself, herself or others." (*Id.*, § II.B.1., 2.) All CDP recruits and officers receive training on the use of force. (Shaw Dep., 32:18–21, 38:5–8, 45:1–9.)

CDP Directive 2.02 sets out the process taken after an officer's firearm is discharged. (Directive 2.02, ECF No. 42-13.) If such an incident results in injury or death, the Critical Incident Response Team ("CIRT") will conduct a criminal investigation. (Directive 2.02, § III.D.4.) Based on their investigation, a determination is made as to whether criminal charges will be filed against the involved officer. (*Id.*) CIRT's investigative packet, including its conclusion as to criminal charges, is then forwarded to the Firearms/Death Review Board ("FRB"). (Directive 2.02, § III.D.4.)

The FRB is a panel of three commanders who "do the administrative review of [an officer-involved] shooting to determine if policy violations had occurred." (Knight Dep., 11:6–8, ECF No. 42-3; Kuebler Dep., 54:25–55:2, ECF No. 42-14.) The FRB reviews CIRT's investigation, but does not conduct its own investigation. (Kuebler Dep., 60:24–25.) Based on that review, the FRB recommends a finding as to whether the shooting was (i) intentional or unintentional, and (ii) a violation of policy or not. (*Id.*, 69:4–12.) The recommendation is then forwarded to the involved

officer's chain of command for a final determination and any resulting discipline. (*Id.*, 70:16–25; Knight Dep., 11:6–8.)

If there is disagreement within the FRB, or between the FRB and the chain of command, the matter is referred to the Chief of Police. (Directive 2.02, § III.E.4.) The matter will likewise be referred to the Chief if the ultimate recommendation is that the involved officer be disciplined outside of the labor contract's progressive discipline regime. (*Id.*) Chief Jacobs's practice was to hold an in-person hearing for all matters referred to her. (Jacobs Dep., 65:19–23, ECF No. 42-6.) In her view, if the chain of command or FRB "felt that the officer had violated [Division] policy on [use of deadly force], [she] believe[d it was] extremely important for [her] to understand what was going on in the officer's mind." (*Id.*, 66:1–5.)

### 3. Division Response to February 6, 2015 Incident

After the shooting of James England on February 6, 2015, CIRT was called to the scene. (Pilya Dep., 183:4–6.) CIRT detectives interviewed Officer Fulwider (Fulwider Int.; Porter Report), Officer Dungey (Dungey Int.), and Sergeant Griffis (Griffis Int.). Officer Abel declined to give a statement. (ECF No. 30-2.)

Officer Abel ultimately provided a written statement to CIRT (ECF No. 30-4) and sat for a recorded interview (Abel Int.). Sergeant Eric Pilya, who conducted that interview, recalled: "It was probably one of the most confusing formal statements that I had taken. If you've read that, you know it's painful. I kept going back to him and trying to get him to articulate his actions better." (Pilya Dep., 194:20–23.) Ultimately, Sergeant Pilya was convinced that "Officer Abel did articulate a reasonable fear of what would happen to him if he was pulled through that

9

window." (*Id.*, 194:24–195:1.) The CIRT investigation concluded with a decision not to file criminal charges. (*Id.*, 189:3–11.)

The matter was next referred to the FRB. In a November 17, 2015 memo to Chief Kim Jacobs, the FRB reported:

> After reviewing the facts, the Firearms/Police-Involved Death Review Board has concluded that Officer Abel's use of firearm was intentional and in violation of policy, as set forth in Directive [2.01], Section II, Subsection B(1).

(ECF No. 30-9.) When the FRB's finding was communicated to Officer Abel, he was not concerned. (Abel Dep., 163:4–5.) He did not think the FRB's finding would be "the final . . . decision or answer to this" and believed "[a]bsolutely" that his actions would be found within policy. (*Id.*, 163:6–18.)

After the FRB issued its finding, the question was sent to Officer Abel's chain of command. Sergeant Griffis disagreed with the FRB's finding. (ECF No. 42-7, PAGEID # 1674–76.) In a December 28, 2015 letter to Chief Jacobs, he explained his view that Directive 2.01 "is in addition to *Graham v. Conner* [*sic*] by adding the component of 'reason to believe' to the use of force assessment." (*Id.*) Sergeant Griffis goes on to recount (perhaps, even, recast) the events leading up to the shooting, ultimately recommending that the incident be found within policy and no further action taken. (*Id.*)

Lieutenant David Knight was next in the chain of command. (Knight Dep., 26:18–19, ECF No. 42-3.) Lieutenant Knight reviewed the CIRT investigation, FRB finding, and Sergeant Griffis's letter, and concluded:

> Based on the totality of the circumstances, I do not believe it was objectively reasonable for Officer Abel to use deadly force to protect

10

> himself or others. I find that Officer Abel's use of firearm was intentional and in violation of policy . . . . I recommend progressive discipline be bypassed due to the seriousness of this violation. I recommend departmental Charges for a violation Division Directive [2.01].

(ECF No. 30-10.) Commander Mark Gardner and Deputy Chief Ken Kuebler agreed with the Lieutenant's conclusion and recommendation. (Knight Dep., 38:3–4; Kuebler Dep., 176:8–11, 179:20–22.) The matter was set for a July 13, 2016 hearing before the Chief. (ECF No. 30-11.)

Following the hearing, Chief Jacobs issued a final determination that Officer Abel's use of deadly force against Mr. England was "not in violation of Division policy." (ECF No. 30-15.) She explained:

> Based upon Officer Abel's statements and evidence obtained during the CIRT investigation and his statements at the Chiefs Hearing, it is clear that Office[r] Abel believed he was in a position that placed him in immediate danger of serious physical harm or death. During this incident, Officer Abel dealt with a rapidly evolving and chaotic situation involving a wanted felonious assault suspect. Officer Abel was familiar with the suspect and he knew about the suspect's long history of violent criminal behavior. The suspect was resistive and posed a serious risk of flight. During the incident, Officer Abel faced being pulled over a wooden barrier by the suspect, which would have exposed Officer Abel to injury from the fall and injury from two aggressive dogs that the suspect would not control. In addition, Officer Abel expressed concern over the suspect gaining possession of his firearm if it had become dislodged from Officer Abel's hand during the fall. In sum, the totality of the circumstances and the evidence indicate to me that Officer Abel's actions were **intentional and not in violation of Division policy**.

(*Id.*) With that, all inquiry into the shooting concluded.

## B.    Procedural Background

Mr. England first filed suit in this Court in February 2017. *See England v. City of Columbus Div. of Police*, Case No. 2:17-cv-014-ALM-KAJ (S.D. Ohio filed on February 3, 2017). Before the 2017 case materially progressed, the parties agreed to

11

a dismissal in light of ongoing state court proceedings. *See id.* (Agreed Entry of Dismissal filed on March 21, 2018). *See also State of Ohio v. England*, Case No. 15 CR B 4964 (Franklin Cty. Mun. Ct.).

Mr. England refiled suit on March 20, 2019. (Compl., ECF No. 1.) As filed, his Complaint named as defendants the City of Columbus, Officer Abel, Officer Fulwider, Officer Dungey, and Sergeant Griffis, and asserted four claims:

- **Count I:** Excessive Force
- **Count II:** Cruel and Unusual Punishment
- **Count III:** Failure to Train/Supervise
- **Count IV:** Negligent Infliction of Emotional Distress

(*Id.*) The parties have since stipulated to the dismissal of Officer Fulwider, Officer Dungey, and Sergeant Griffis (ECF No. 15) as well as Counts II and IV (ECF No. 16). What remains are Count I, a § 1983 claim asserted against Officer Abel, and Count III, a *Monell* claim against the City.[4] Officer Abel and the City have moved for summary judgment as to each.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine

---

[4] For purposes of the *Monell* claim, the Division and the City are considered one and the same. *See Williams v. Dayton Police Dep't*, 680 F. Supp. 1075, 1080 (S.D. Ohio 1987) (characterizing the police department and organized crime unit as "sub-units of the city government and are merely vehicles through which the city fulfills its policing functions" and dismissing claims against them in favor of claims against the city).

issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.   OFFICER ABEL'S MOTION FOR SUMMARY JUDGMENT

### A.   Genuine issues of material fact preclude summary judgment on Count I.

Officer Abel argues in favor of summary judgment on Mr. England's excessive force claim on the grounds that his use of force was justified (*i.e.*, not a violation of Mr. England's constitutional rights) and that he is entitled to qualified immunity.

13

"When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport v. Causey*, 521 F. 3d 544, 550 (6th Cir. 2008). Qualified immunity is intended to "give[ ] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). An official is entitled to the defense of qualified immunity so long as he has not violated a "'clearly established statutory or constitutional right[] of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). The analysis therefore involves two steps: (1) determine "whether the facts . . . shown . . . make out a violation of a constitutional right," and (2) determine whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### 1.    Constitutional Violation

Mr. England alleges that Officer Abel violated his constitutional right to be free from excessive force. Excessive force claims are analyzed under the Fourth Amendment's protection against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The court "must balance the

14

consequences of the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F. 3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). The Supreme Court has recognized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

Courts have long held that the use of deadly force is objectively reasonable only when an officer has "probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others." *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007) (emphasis omitted). Though "the ultimate question . . . is whether [an officer's] decision to use deadly force . . . was reasonable under the totality of the circumstances," *Mitchell v. Schlabach*, 864 F.3d 416, 422 (6th Cir. 2017) (citation omitted), particular attention is paid to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

And so, the Court first considers whether the evidence presented demonstrates that, at the time of the shooting, Officer Abel had probable cause to believe that Mr. England posed an imminent danger of causing death or serious physical harm. The answer hinges on the finding of material facts presently in dispute.

15

Officer Abel and his colleagues arrived at Dolby Drive on the morning of February 6, 2015, to execute an arrest warrant on Mr. England for felony assault charges. Although they had never personally interacted, Officer Abel knew of Mr. England—including that he was under investigation by the CDP Narcotics Bureau and that he had a history of domestic violence.

When Officer Abel encountered Mr. England in the rear of his home, he believed that Mr. England was trying to evade the officers waiting at his front door. But on Officer Abel's command, Mr. England put his hands on his head and backed towards the patio door. Officer Able grabbed both of Mr. England's hands; Mr. England remained compliant as the officers struggled to handcuff him over the plywood. Officer Abel had no particularized[5] reason to believe Mr. England was armed that morning. Still, Officer Abel had his TASER in hand. While working with Officer Fulwider to handcuff Mr. England, Officer Abel fumbled his TASER and it fell to the ground.

Mr. England's two dogs were on the patio, barking and jumping up the enclosure's walls. The officers commanded Mr. England to control the dogs. Mr. England, now handcuffed, did what he could to comply by yelling at the dogs to go back inside; only one obeyed.

---

[5] The generalized notion that individuals suspected of narcotics trafficking are often armed and dangerous is not sufficient for this analysis. *See Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007) (declining to accept as justification for the use of deadly force "a general notion that crack dealers are dangerous, rather than a particularized and supported sense of serious danger about a particular confrontation").

His TASER out of reach, Officer Abel drew his firearm and held it in his right hand. He used his left arm to grab Mr. England as he and Officer Fulwider tried to lift Mr. England off the ground and over the plywood covering the patio door. Through all of this, Mr. England did not resist.

Officer Fulwider released Mr. England to try and stabilize Officer Abel by holding onto his gunbelt. Officer Abel, arm still locked onto Mr. England and unaware that Officer Fulwider was trying to brace him, felt his weight shift forward and fired two shots.

Officer Abel concedes that he was not looking at Mr. England in the moments before he fired. (Abel Dep., 111:9–112:9.) Officer Fulwider was facing Officer Abel's back, so could not see what precipitated the shots. Sergeant Griffis was also unable to see into the patio, but believed that Officer Abel had shot at the dogs. (Griffis Inc., 15:25.) Officer Dungey saw that Mr. England "broke free" and dove through the dog door, but also believed Officer Abel had fired at the dogs. (Dungey Int., 14:50.)

When the dust settled, critical questions were left unanswered. First, what caused Officer Abel to tip forward? Did his weight shift because Mr. England lunged in a late-stage attempt to overtake Officer Able—or merely because gravity affected his perch atop the plywood? Second, did Officer Abel know, or should he have known, that Mr. England was handcuffed? Did Officer Abel himself fasten the second cuff on Mr. England's wrist—or did he reasonably believe that Mr. England's hands were unrestrained? Whether Officer Abel had probable cause to believe that Mr. England posed an imminent threat of serious physical harm, and the use of

deadly force was therefore justified under the circumstances, turns on these questions of fact. Accordingly, summary judgment is not appropriate. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988).

### 2.    Clearly Established Right

The Court next determines whether the right at issue was clearly established as of the date of the shooting. For a right to be 'clearly established,' "existing precedent must have placed the statutory or constitutional question beyond debate[,]" although there need not be a case "directly on point." *al-Kidd*, 563 U.S. at 741. The right must be dictated by "'controlling authority in the[ ] jurisdiction at the time of the incident' or [by] 'a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful.'" *Id.* at 746 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). *See also Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 589. Moreover, the "right" at issue must be "so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 309). That is, there must exist a precedent where "an officer acting under similar circumstances . . . was held to have violated" the constitutional provision at issue. *White*, 137 S. Ct. at 552.

It is settled law that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. *See also*

18

*Mitchell*, 864 F.3d at 426 ("[A]n unarmed defendant has a right not to be shot dead when he does not pose a risk of danger to police or the public"). It is further settled that "various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 209–03 (6th Cir. 2004) (finding that the use of pepper spray against handcuffed and hobbled suspect was excessive) (citing, *inter alia*, *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) (same); *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002) (same, beating); *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988) (same, nightstick)).

Construing the facts in the light most favorable to Mr. England, this case presents a circumstance in which a suspect was handcuffed on a partially-enclosed patio with two aggressive dogs, but was complying with officer commands, was not physically resisting the officers' grasp, made no verbal threats to the officers, and was not armed. The arresting officer, who had drawn his service weapon, lost his balance and feared falling into the enclosure with the suspect and the dogs. Though a precarious scenario, *the suspect* was not the source of any threat. *Cf., Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 567–68 (6th Cir. 2016) (analyzing whether the shooting of two dogs was an unreasonable seizure by looking at "whether [*the*] *pet* constitutes an imminent threat from the perspective of a reasonable officer on the scene") (alterations in original omitted) (emphasis added). *The suspect* in this case was subdued and nondangerous—and had a constitutional right not to be shot.

Officer Abel proposes that this framing is both inaccurate and too general. He encourages the Court to conclude that the right asserted was not clearly established because Mr. England "cannot point the Court to existing precedent that squarely governs the specific facts and circumstances of this case." (Reply, 10.) In his view, the right would be clearly established by case law involving "an officer shooting a resisting felony suspect to stop the suspect from pulling the officer into an enclosed area containing pit bulls." (*Id*.)

The Court cannot adopt Officer Abel's narrow view. On a defendant's motion for summary judgment, all facts must be construed in the light most favorable to the plaintiff. *See Mitchell*, 864 F.3d at 421 (citation omitted). Mr. England has consistently maintained—and a reasonable jury could find—that he was neither resisting nor pulling Officer Abel. What's more, the Court need not confine its inquiry to the rare case involving a 'pit of pit bulls.' The Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The law, as it stood on February 6, 2015, provided Officer Abel with such notice.

## B. Officer Abel raised new arguments in his Reply.

Officer Abel proffers four arguments in his reply: (i) that Mr. England's assertion that he was not resisting arrest at the time of his shooting is barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994); (ii) that Mr. England's assertion that he did not lunge, but was instead "pushed forward," is also *Heck*-barred; (iii) that Officer Abel's use of force was objectively reasonable under the circumstances; and (iv) that Officer Abel is entitled to qualified immunity. (Abel Reply.) The third and

20

fourth arguments clearly flow from Officer Abel's Motion for Summary Judgment and Mr. England's Response in Opposition; the first and second do not. Mr. England moves to strike the "new arguments" made in Officer Abel's reply memorandum or, in the alternative, for leave to file a sur-reply. (Mot. to Strike.)

It is well-established that "a reply brief is not the proper place to raise an issue for the first time." *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, No. 2:10-cv-249, 2011 WL 53462, at *3 n.2 (S.D. Ohio Jan. 7, 2011) (Frost, J.) (citing *Lexion, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 676 (6th Cir. 2006) (Griffin, J., concurring in part)). That rule presides, in large part, because "[a]n issue raised for the first time in a reply brief has not been fully briefed, and thus, is not appropriate for decision." *Baker v. Union Twp., Ohio*, No. 1:12-cv-112, 2013 WL 4502736, at *13 (S.D. Ohio Aug. 22, 2013) (Barrett, J.) (collecting cases). *See also U.S. v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("It is impermissible to mention an issue for the first time in a reply brief because the [opponent] then has no opportunity to respond.") (quoting *Knighten v. Comm'r of Internal Revenue*, 702 F.2d 59, 60 n.1 (5th Cir. 1983)).

Nonetheless, "there is a strong preference that claims be adjudicated on the merits." *NCMIC Ins. Co. v. Smith*, 375 F. Supp. 3d 831, 836 (S.D. Ohio 2019) (Sargus, J.) (internal quotations and citation omitted). By granting Mr. England leave to file a sur-reply, the Court will be afforded an opportunity to fully address *Heck*'s impact on Mr. England's claims. Accordingly, Mr. England's Motion is

**DENIED** to the extent it seeks to strike the *Heck*-based arguments[6], and

**GRANTED** to the extent it seeks leave to file a sur-reply addressing those

arguments. Mr. England's sur-reply (Sur-Reply, ECF No. 47-1), filed as an

attachment to his Motion, is considered for that purpose. The Court turns now to

the merits.

### C.    Count I is not *Heck*-barred.

Officer Abel argues that the Supreme Court's holding in *Heck v. Humphrey*

bars Mr. England from asserting that he was compliant with the arresting officers

and that he did not pull Officer Abel but was, in fact, pushed in the critical moment

before the shooting. (Abel Reply, 1–5.) The argument is unavailing. Under *Heck*, "to

recover damages for . . . harm caused by actions whose unlawfulness would render a

conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or

sentence has been reversed . . . , expunged . . . , declared invalid . . . , or called into

question" by the appropriate tribunal. *Heck*, 512 U.S. at 487 (footnote omitted).

Without such a ruling, "§ 1983 damages actions that necessarily require the

plaintiff to prove the unlawfulness of his conviction" must be dismissed. *Id.* at 486.

Stated differently, *Heck* bars any § 1983 claim that "would necessarily imply the

---

[6] Although the Court denies Mr. England's motion to strike the *Heck*-based arguments in favor of discussing them on the merits, it is worth noting that those arguments could have been raised in Officer Abel's Motion for Summary Judgment without any of the clairvoyant anticipation about which he complains. The progression of this matter over the last several years—including Mr. England's Complaint (Compl., ¶ 31), deposition testimony (England Dep., 41:1–4), and testimony during state court proceedings (ECF No. 47-2, 41:10–11)—gave Officer Abel ample notice that Mr. England would base his excessive force claim on a version of events in which he was compliant with the arresting officers and did not lunge.

invalidity of a conviction." *Schreiber v. Moe*, 596 F.3d 323, 335 (6th Cir. 2010) (quoting *Nelson v. Campbell*, 541 U.S. 637, 647 (2004)).

It is undisputed that Mr. England pled guilty to resisting arrest on February 6, 2015. Whether *Heck* bars an excessive force claim arising out of the same events as a resisting arrest conviction depends upon the sequence of the arrest, resistance, and application of force. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 611 (6th Cir. 2014) (explaining that "a criminal conviction for resisting arrest in Ohio cannot stand where a criminal defendant successfully asserts the affirmative defense of pre-arrest excessive force; and a § 1983 claim of excessive force would necessarily imply the invalidity of an underlying conviction for resisting arrest" but that "*Heck* does not bar § 1983 suits alleging *post-arrest* excessive force") (emphasis in original). If "the alleged excessive force is used *after* the suspect ceases resisting arrest," the § 1983 claim can go forward. *Id.* at 612 (quoting *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 992 (N.D. Ohio 2008)). Conversely, the validity of a resisting arrest conviction is necessarily called into question by a § 1983 excessive force claim if the "force occurred before and during the resistance and was only used to procure the arrest." *Id.*

Officer Abel points to the sworn complaint charging Mr. England with resisting arrest, which states:

> . . . [Mr. England] would not comply with officers['] orders. He tensed up and struggled with officers as they attempted to handcuff him. He then lunged forward dragging an officer over a walled partition.

(ECF No. 38-6, PAGEID # 954.) He argues that Mr. England conceded the truth of these facts when he pled guilty to the charge, and so his excessive force claim

(alleging very different facts) "necessarily implies the invalidity of his conviction." (Abel Reply, 3–4.) Mr. England argues in response that he was not aware of the complaint's language at the time of his plea. (Sur-Reply, 9–10.) He submits the transcript of a June 6, 2019 hearing before Franklin County Municipal Court Judge David B. Tyack on Mr. England's motion to vacate his 2015 guilty plea. (ECF No. 47-2.) In that hearing, Judge Tyack explained that, although Mr. England's initial plea hearing was recorded, the court was unable to locate the machine that contained the recording. (*Id*., 18 ("[W]e did make a record, we just don't have the video and audio recording of what happened[.]").) Mr. England went on to testify under oath that he was not shown the complaint and did not review the complaint prior to entering his guilty plea. (*Id*., 40.) Mr. England further argues that his pre-arrest conduct on February 6, 2015, could form the basis of a legitimate plea to resisting arrest, but maintains that he surrendered and was not resistant after Officer Abel was able to grab his hands over the patio door. (Sur-Reply, 7.)

The Court is persuaded that Count I does not necessarily imply the invalidity of Mr. England's conviction of resisting arrest. Ohio law defines the offense as follows: No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another. Ohio Rev. Code § 2921.33(A). Mr. England was found sneaking out the rear entrance of his home while officers waited to arrest him at the front door. (*See* Abel Aff., ¶ 85.) On encountering him mid-escape, Officer Abel described Mr. England as slow to cooperate and not fully compliant with orders before Officer Abel could get his hands on Mr. England. (*See id*., ¶¶ 94, 100,

24

109.) Because the factual basis of Mr. England's guilty plea is unclear at best, and because this pre-handcuffing conduct could form the sole basis of that plea, Mr. England's excessive force claim does not necessarily imply the invalidity of the conviction and is not barred by *Heck*. *Cf. Lucier v. City of Ecorse*, 601 F. App'x 372, 377 (6th Cir. 2015) (concluding that *Heck* did not bar plaintiff from relying on wife's partial description of events giving rise to both resisting arrest plea and excessive force claim where "the factual basis of Plaintiff's guilty plea was never specified" and the guilty plea could "have been wholly based" on the portion of the events not seen or described by the wife).

For these reasons, Officer Abel's Motion for Summary Judgment is **DENIED**.

## IV.   CITY'S MOTION FOR SUMMARY JUDGMENT

Section 1983 does not "incorporate doctrines of vicarious liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Accordingly, "[a] plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to the [City] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994)). "There must be a direct causal link between the policy and the alleged constitutional violation." *Id.* (internal quotation and citation omitted). In

25

other words, the plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 879–80 (6th Cir. 2020) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

A municipal policy or custom may be proved by four methods: (1) an official policy or legislative enactment; (2) ratification of illegal acts by an official with final decision-making authority; (3) inadequate training or supervision; or (4) a custom of tolerance or acquiescence of constitutional violations. *See Burgess*, 735 F.3d at 478 (citation omitted). The City argues that Mr. England fails to present evidence sufficient for a reasonable jury to find in his favor on any of these four theories. As to the ratification theory, the Court disagrees.

### A.    Official Policy or Legislative Enactment

Mr. England first argues that CDP's Directive on the use of force permitted Officer Abel to violate his constitutional rights. The City responds, and the Court is persuaded, that Mr. England has not presented sufficient evidence for a reasonable jury to agree.

The official written CDP directive on use of deadly force provides, in pertinent part, as follows:

> Sworn personnel may use deadly force when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm.

> Sworn personnel may use deadly force upon a human being to prevent escape when there is probable cause to believe that the suspect poses an ***immediate*** threat of serious physical harm to himself, herself, or others.

(Directive 2.01, § II.B.1.–2.) Mr. England concedes that, as written, the policy "appear[s] to be consistent with the requirements of the Constitution," but argues that "the actual customs and usages of the [Division] are inconsistent with" those requirements because they allow police officers "to use deadly force if they experience subjective fear." (Resp., 31.) Although Mr. England is correct that "a city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written," *Jackson v. City of Cleveland*, 925 F.3d 793, 830 (6th Cir. 2019) (citations omitted), the evidence and argument that the City maintained such an unwritten policy is better suited for examination elsewhere.

### B.    Ratification

Mr. England further argues that the City is liable for the constitutional violation alleged because the use of force was ratified, or expressly approved, by Chief Jacobs. Under the ratification theory of *Monell* liability, if a municipal officer with final decision-making authority "approve[s] a subordinate's decision and the basis for it, [the] ratification would be chargeable to the municipality[.]" *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988). "Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citation omitted). Even if it is shown that a municipality subsequently ratified a decision, a plaintiff must still "prove that the ratification was a 'moving force' in causing the constitutional violation." *Id*. at 656 n.6 (quoting *Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir. 1991)).

It is undisputed that Chief Jacobs affirmatively approved Officer Abel's use of deadly force against Mr. England—despite "out of policy" recommendations from the chain of command review and FRB—and that her decision on the matter was final. What is disputed is whether the ratification constitutes or confirms the existence of a City policy that deadly force may be used on a suspect when a CDP officer subjectively—but unreasonably—fears for his life. Mr. England has presented evidence indicating that there is space between what is permitted by CDP and what is permissible under the law. That space is the involved officer's subjective understanding of the situation. Officer Abel's testimony indicating "absolute" confidence that his actions would ultimately be found within policy (Abel Dep., 162:22–163:23), Sergeant Griffis's letter describing CDP policy as "adding" a subjective component to the use of force assessment established in *Graham v. Connor* (ECF No. 42-7, PAGEID # 1674), and Chief Jacobs's testimony emphasizing "what was going on in the [involved] officer's mind" and whether that officer can "articulate" a fear of harm (Jacobs Dep., 66:1–5, 109:9–15) can all be read as supporting Mr. England's view. Accordingly, the question must be submitted to a jury.

A jury must also decide whether Chief Jacobs's ratification was a moving force behind Mr. England's injury. The City urges the Court to dispose of the claim because a "post-incident ratification" can "*never*" be a moving force in causing the offensive conduct that was ratified. (City Mot., 8.) The City overstates the law. The court in *Alexander v. Beale Street Blues Co., Inc.*, one of the cases cited by the City,

acknowledges that "ratification might tend to establish the existence of a policy . . . that in itself was a 'moving force.'" 108 F. Supp. 2d 934, 949 (W.D. Tenn. 1999). At this stage, the crucial question "is not whether the ratification caused the injury. It is whether the misconduct that caused the injury was ratified . . . such that it may be considered official policy." *Davis v. City of Columbus, Ohio*, No. 2:17-cv-823, 2021 WL 4399755, at *6 (S.D. Ohio Sept. 27, 2021) (Marbley, J.) (citation omitted).

### C.  Failure to Train

Mr. England further argues that CDP "has not trained its officers in the constitutional limitations on the use of deadly force, but on a different set of standards of its own making." (Resp., 34.) "[T]here are limited circumstances in which an allegation of a 'failure to train' [police officers] can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Those circumstances arise "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 389. Accordingly, a failure to train claim requires a showing that

> (1) the training . . . was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.

*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citation omitted). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Miller v. Calhoun Cty.*, 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Two situations may

29

justify a conclusion of deliberate indifference in claims of failure to train: First, a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction," and second, a failure "to act in response to repeated complaints of constitutional violations[.]" *Ellis*, 455 F.3d at 700–01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

The City argues that Mr. England fails to present sufficient evidence for a reasonable jury to find that CDP training on the use of deadly force was inadequate or that any such inadequacy was the result of deliberate indifference. The Court agrees. To support his argument that Officer Abel was trained to use deadly force in violation of the constitution, Mr. England offers CDP Defensive Tactics Unit training decks from 2007 and 2009 and testimony that CDP officers are trained to react to "the threat, not the action." (Resp., 14–15 (quoting Shaw Dep., 107:8–9).) The training decks divide the population into three categories: sheep (naïve civilians), wolves (violent predators), and sheepdogs (armed police). (Resp., 14, 32–33. *See also* ECF Nos. 42-10, 42-17.) Though "distasteful," the slides do not evidence the sort of deliberate indifference remediable under the failure to train theory. *See King v. City of Columbus*, No. 2:18-cv-1060, 2021 WL 3367507, at *11 (S.D. Ohio Aug. 3, 2021) (Sargus, J.). The cited testimony is similarly unhelpful to Mr. England's claim. In context, Officer Shaw testified that, depending on the totality of the circumstances, an officer could be justified in using deadly force against a suspect with a firearm in their waistband without that suspect affirmatively

reaching for the firearm. (Shaw Dep., 105:22–108:2.) The Court finds no issue with Officer Shaw's more nuanced premise.

### D.    Custom of Tolerance

Finally, Mr. England argues that CDP had a custom of tolerating excessive force incidents. To proceed on a custom of tolerance theory, a plaintiff must establish:

> (1) the existence of a clear and persistent pattern of [unconstitutional conduct] by municipal employees; (2) notice or constructive notice on the part of the City; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Arendale v. City of Memphis*, 519 F.3d 587, 599–600 (6th Cir. 2008) (citing *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007); *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)). A pattern of inadequate investigations into unconstitutional conduct can form the basis for a custom of tolerance claim. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005); *Leach v. Sheriff of Shelby Cty.*, 891 F.2d 1241 (6th Cir. 1989)

Mr. England's principal theory is that CDP's investigative process is designed to insulate officers from accountability for unconstitutional uses of force, rather than implement such accountability. (*See* Resp., 38.) As support, he offers testimony reflecting that few *if any* CDP officers have *ever* been disciplined or referred for criminal charges on account of excessive force, and notes that the Chief's Hearing consists only of a presentation by the involved officer and his counsel. Although that evidence may be consistent with Mr. England's theory, it falls short of showing a

clear and persistent pattern of inadequate investigations or unconstitutional uses of force.

Because Count III may proceed on a ratification theory, the City's Motion for Summary Judgment is **DENIED**.

## V.  CONCLUSION

For the reasons set forth above, Mr. England's Motion to Strike (ECF No. 47) is **GRANTED IN PART** and **DENIED IN PART**. Officer Abel's Motion for Summary Judgment (ECF No. 38) on Count I is **DENIED**. Finally, the City's Motion for Summary Judgment (ECF No. 39) on Count III is also **DENIED**.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison                    
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**